[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10094

_____

D.C. No. 1:14-cv-21803-KMW

CHEYLLA SILVA,
JOHN PAUL JEBIAN,

Plaintiffs-Appellants,

versus

BAPTIST HEALTH SOUTH FLORIDA, INC.,
BAPTIST HOSPITAL OF MIAMI, INC.,
SOUTH MIAMI HOSPITAL, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 8, 2017)

Before HULL, MARTIN, and EBEL,* Circuit Judges.

_____

* The Honorable David M. Ebel, Senior United States Circuit Judge for the United States Court
of Appeals for the Tenth Circuit, sitting by designation.

EBEL, Circuit Judge:

Plaintiffs Cheylla Silva and John Paul Jebian are profoundly deaf. On numerous occasions, they presented at Defendants' hospitals but allegedly could not communicate effectively with hospital staff because of the absence of certain auxiliary aids or services. Federal law requires, however, that healthcare providers offer appropriate auxiliary aids to hearing-impaired patients where necessary to ensure effective communication. Failure to do so constitutes discrimination against disabled persons. Plaintiffs bring this lawsuit under Title III of the Americans with Disability Act (ADA), 42 U.S.C. §§ 12181-12189, and Section 504 of the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794, alleging unlawful discrimination by Defendants Baptist Hospital of Miami, Inc. (Baptist Hospital), South Miami Hospital, Inc. (SMH), and Baptist Health South Florida, Inc. (Baptist Health) (collectively, Baptist).

The district court awarded summary judgment to Defendants. It held that Plaintiffs lacked Article III standing to seek prospective injunctive relief because they did not show that they were likely to return to the hospitals in the future. In addition, the district court denied damages on the grounds that Plaintiffs failed to show any instances where communication difficulties resulted in any actual adverse medical consequences to them, and otherwise failed to articulate what they did not understand during their hospital visits. The court concluded that records

2

showed that Plaintiffs communicated their chief medical complaints and understood the treatment plan and discharge instructions, which foreclosed an ineffective-communication claim.

We reverse the district court on these issues. Not only do we conclude that Plaintiffs have standing to seek injunctive relief, we also reject the district court's substantive standard for liability. For an effective-communication claim brought under the ADA and RA, we do not require a plaintiff to show actual deficient treatment or to recount exactly what the plaintiff did not understand. Nor is it a sufficient defense for a defendant merely to show that a plaintiff could participate in the most basic elements of a doctor-patient exchange. Rather, the relevant inquiry is whether the hospitals' failure to offer an appropriate auxiliary aid impaired the patient's ability to exchange medically relevant information with hospital staff.

We conclude that Plaintiffs have offered sufficient evidence to survive summary judgment. The record is rife with evidence that, on particular occasions, Plaintiffs' ability to exchange medically relevant information was impaired. Ultimately, however, to win monetary damages—which Plaintiffs seek in addition to equitable relief—Plaintiffs still must show that Defendants were deliberately indifferent in failing to ensure effective communication. The district court did not address this question. Thus, we REVERSE the district court's order granting

3

summary judgment to Defendants, and REMAND for further proceedings, including consideration of the deliberate-indifference issue.

## BACKGROUND

Plaintiffs Silva and Jebian are deaf and communicate primarily in American Sign Language (ASL). Both of them can read and write in simple English—Jebian communicates with "very basic" proficiency and Silva reads at a fifth-grade level. Doc. 78 ¶¶ 60, 81. Defendants are two hospitals, Baptist Hospital and SMH, and their parent organization, Baptist Health.[1] As places of public accommodation and recipients of federal Medicaid funds, Defendants are obligated to follow the mandates of the ADA and RA, which require healthcare facilities to ensure effective communication between hearing-impaired patients and medical staff. 28 C.F.R. § 36.303(c)(1); 45 C.F.R. § 84.52(d)(1).

Plaintiffs separately visited Defendants' facilities numerous times. They allege that, on many of those occasions, Defendants failed to provide appropriate auxiliary aids necessary to ensure effective communication.[2] While Plaintiffs requested live on-site ASL interpreters for most visits, Defendants relied primarily on an alternative communication method called Video Remote Interpreting (VRI).

---

[1] Baptist Health does not provide any healthcare services; rather, it owns and operates medical facilities, including Baptist Hospital and SMH, which provide such services.

[2] The ADA defines "auxiliary aids and services" to include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments[.]" 42 U.S.C. § 12103(1)(A).

With this internet-connected machine, a live ASL interpreter is located remotely and communicates with the doctor and patient through a portable screen located in the hospital.

During many of Plaintiffs' hospital visits, Defendants attempted to use this device. However, the VRI machines routinely suffered from technical difficulties that either prevented the device from being turned on, or otherwise resulted in unclear image quality, thereby disrupting the message being communicated visually on the screen. When the VRI machine was unavailable or malfunctioned, hospital staff would often rely on family-member companions for interpretive assistance, or would exchange hand-written notes with Plaintiffs themselves. On some occasions, after a VRI breakdown, an on-site ASL interpreter would be called to assist with communication. These instances occurred both when Plaintiffs presented as patients, and when Jebian accompanied his father to Defendants' facilities for treatment.[3]

Plaintiffs brought this lawsuit under the ADA and RA for unlawful discrimination. They alleged that Baptist's facilities failed to provide appropriate auxiliary aids to ensure effective communication with hospital staff. They sought injunctive relief and monetary damages. The district court awarded summary

---

[3] Deaf persons are protected by the ADA and RA not only as patients, but also as companions to patients who are seeking treatment. 28 C.F.R. § 36.303(c)(1).

judgment in Defendants' favor.  It held that Plaintiffs lacked Article III standing for injunctive relief and, further, that they had not shown a "genuine dispute as to any material fact" regarding a violation of the ADA and RA.  Fed. R. Civ. P. 56(a). The district court faulted Plaintiffs for failing to show that the denial of requested auxiliary aids resulted in any adverse medical consequences or inhibited their communication of the "chief medical complaint" or "instructions under the treatment plan."  Doc. 133 at 30, 33-34.  Moreover, in the district court's view, Plaintiffs' inability to articulate what they could not understand on particular visits was fatal to their effective-communication claims.

## DISCUSSION

ADA and RA claims are governed by the same substantive standard of liability.  See, e.g., Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000).  To prevail, a disabled person must prove that he or she was excluded from participation in or denied the benefits of the hospital's services, programs, or activities, or otherwise was discriminated against on account of her disability. Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001).   Such exclusion, denial, or discrimination occurs when a hospital fails to provide "appropriate auxiliary aids and services" to a deaf patient, or a patient's deaf companion, "where *necessary* to ensure *effective communication*."  28 C.F.R. § 36.303(c)(1) (emphases added). That is the touchstone of our inquiry.

6

But proving the failure to provide a means of effective communication, on its own, permits only injunctive relief.  See, e.g., McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1147 n.8 (11th Cir. 2014).  To recover monetary damages, a disabled person must further show that the hospital was deliberately indifferent to her federally protected rights.  See, e.g., Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 344, 345 (11th Cir. 2012) (stating that, to recover compensatory damages, a disabled plaintiff must show "that the [h]ospital's failure to provide appropriate auxiliary aids was the result of *intentional* discrimination" and "deliberate indifference is the appropriate standard for defining discriminatory intent") (internal quotation marks omitted).  Resolving the case solely on the ineffective-communication issue, the district court declined to consider deliberate indifference.

After reviewing the record evidence in the light most favorable to the Plaintiffs, we hold that summary judgment was improper.[4]  First, the district court erroneously denied prospective injunctive relief on the basis of Article III standing, concluding in error that Plaintiffs did not show they were likely enough to return to the hospitals in the future or otherwise to suffer discrimination again at those

---

[4] We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in their favor.  Liese, 701 F.3d at 341-42.  Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

facilities.  Second, the district court improperly rejected all relief based on its conclusions that Plaintiffs did not identify any actual adverse medical consequences resulting from ineffective communication, and did not specify what they were unable to understand or convey during their visits, such as the inability to comprehend their treatment plan and discharge instructions or to communicate their principal symptoms.

The district court's legal standard was flawed.  Instead, the correct standard examines whether a hospital's failure to offer an appropriate auxiliary aid impaired a deaf patient's ability to *exchange medically relevant information* with hospital staff.  Applying that standard to this record, construing all facts in Plaintiffs' favor, we conclude that their claims are suitable for a finder of fact.  We therefore reverse the district court's order awarding summary judgment to Defendants and remand.  Because Plaintiffs also must prove deliberate indifference to win monetary relief— an issue the district court did not decide—we remand for consideration of that question as well.

## I.    **Plaintiffs Have Standing for Injunctive Relief**

In this lawsuit, Plaintiffs seek both injunctive relief and compensatory damages.  Their request for a permanent injunction is predicated on their claim that Defendants maintain unlawful policies and practices that result in ongoing discrimination against hearing-impaired persons.  The question on appeal is

8

whether Plaintiffs have Article III standing to proceed with their claims for injunctive relief. To satisfy the injury-in-fact requirement for constitutional standing, a plaintiff seeking injunctive relief in relation to future conduct "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1328 (11th Cir. 2013) (internal quotation marks omitted). This requires the patients to establish "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." See id. at 1334 (internal quotation marks omitted). To establish such a threat, each patient must show that (1) there is a "real and immediate" likelihood that he or she will return to the facility and (2) he or she "will likely experience a denial of benefits or discrimination" upon their return. See McCullum, 768 F.3d at 1145-46.

On this ground, the district court held that Plaintiffs lacked Article III standing, reasoning that "it is merely speculative that Plaintiffs will return to Defendants' hospitals and there is no reliable indication that the VRI technology will malfunction in the future." Doc. 133 at 34. We disagree.

In the ADA context, our standing inquiry has focused on the frequency of the plaintiff's visits to the defendant's business and the definitiveness of the plaintiff's plan to return. See Houston, 733 F.3d at 1337 n.6. Here, it is evident that Plaintiffs have offered evidence sufficient to support a finding that (1) they

9

will return to Defendants' facilities; and (2) they "will likely experience a denial of benefits or discrimination" upon their return.  See McCullum, 768 F.3d at 1145-46.

For example, Silva testified in a declaration: "Due to many factors, including the location of my doctors, the fact that Defendants have all of my medical records and history, the proximity to my home, and history of prior care/treatment, it is likely I will visit and receive treatment at Defendants' hospitals."  Doc. 61-13, ¶ 22.  Jebian asserted the same in his declaration, and added that he would also go to that same hospital "as a companion of my father in the near future, due to his ongoing health concerns and required follow-up," Doc. 61-14 ¶ 17.  See Houston, 733 F.3d at 1337 (concluding that because the plaintiff had been to the defendant's store in the past, wanted to return, and took frequent trips past the store, it was "likely" she would return to the store, and therefore the threat of future injury was not merely conjectural or hypothetical).

What is more, Plaintiffs collectively have attended Defendants' facilities dozens of times in the years preceding this lawsuit, and Silva has attested that she has recurring health issues.  Further, Plaintiffs routinely experienced problems with the VRI devices not working at all or failing to transmit a clear screen image, so

10

there is good reason to believe that will continue to happen at Defendants' facilities when Plaintiffs do return.[5]

McCullum v. Orlando Regional Healthcare System, Inc., 768 F.3d 1135 (11th Cir. 2014) does not compel a different conclusion. In that case, there was no evidence that the deaf patient would return to the hospital after a successful surgery removed "the organ causing the problem." Id. at 1146 (internal quotation marks omitted, alteration omitted). Nor was there evidence that the hospital would deny his future requests for an in-person interpreter. Id.

Accordingly, given Plaintiffs' numerous visits to Defendants' facilities and the wealth of evidence showing repeated VRI malfunctions, we conclude that Plaintiffs have Article III standing to proceed with their claims for injunctive relief.[6]

---

[5] Plaintiffs' individual experiences with the malfunctioning VRI machines are not the only evidence that such problems will reoccur. An administrator at Baptist Hospital testified that the VRI, on other occasions, had poor reception.

[6] We also conclude there is a factual dispute concerning Plaintiffs' allegation that Baptist has a policy in violation of the ADA and RA of using VRI across the board, even when an in-person interpreter is warranted. A hospital administrator of Defendants' facilities testified that, "[b]ecause of [the VRI] technology, we have largely moved away from using in-house interpreters." Doc. 61-3 at 55-56. She further stated that "[t]he policy was because we had the [VRI], that we used as our live interpreter." Id. at 26.

On the other hand, there is evidence that Defendants at times have relied less exclusively on VRI and have provided an in-person interpreter when warranted. For example, the record indicates that Baptist Hospital provided Silva with an in-person interpreter on January 4, 2011 and March 9-10, 2015. And SMH provided Silva with an in-person interpreter on six occasions: April 29, 2014; July 8-10, 2014; July 18, 2014; August 1, 2014; August 22, 2014; and September 8, 2014. Some of this evidence was later contradicted by Silva.

## II.    <u>Plaintiffs Have Offered Evidence Sufficient to Defeat Summary Judgment</u>

The district court awarded Defendants summary judgment because it found no triable issue of fact regarding the ineffectiveness of the communication aids offered at Defendants' hospitals.  We first analyze the proper standard for evaluating effective-communication claims under the ADA and RA, and then we examine the evidence offered to overcome summary judgment.

### A. The Standard for Effective Communication

The district court faulted Plaintiffs for failing to show two things.  First, Plaintiffs could not identify any instances where the means of communication resulted in actual misdiagnosis, incorrect treatment, or adverse medical consequences.  Second, Plaintiffs could not articulate what information they were unable to understand or convey during their hospital visits.  More specifically, there was no evidence Plaintiffs could not communicate their chief medical complaint or understand a treatment plan and discharge instructions.  We address these requirements in turn, ultimately concluding that they are not the appropriate tests for evaluating effective-communication claims.  Instead, the correct standard examines whether the deaf patient experienced an impairment in his or her ability to *communicate* medically relevant information with hospital staff.  The focus is on the effectiveness of the communication, not on the medical success of the outcome.

1.  Plaintiffs' Failure to Show Adverse Medical Consequences

The district court relied, in part, on Plaintiffs' failure to prove that any communication difficulties resulted in a misdiagnosis, incorrect treatment, or other adverse medical consequences.  Doc. 133 at 4 ("There is no specific fact . . .  demonstrating that either Plaintiff was misdiagnosed, was given the wrong treatment, [or] was impeded in complying with medical instructions for follow-up care . . . ."); id. at 5 ("Plaintiffs are unable to point to any specific fact, incident, course of treatment, or diagnosis supporting the conclusion that communication at Defendants' hospitals was ineffective.").  This is simply not the correct standard for effective-communication claims.

The ADA and RA focus not on quality of medical care or the ultimate treatment outcomes, but on the equal opportunity to *participate* in obtaining and utilizing services.  ADA, 42 U.S.C. § 12182(b)(1)(A)(ii) ("It shall be discriminatory to afford an individual . . . on the basis of a disability . . . with the *opportunity to participate in* or benefit from a good [or] service . . . that is not equal to that afforded to other individuals." (emphasis added)); RA, 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the *participation in*, be denied the benefits of, or be subjected to discrimination . . . ." (emphasis added)); 45 C.F.R. § 84.4(b)(1)–(b)(1)(ii) ("A recipient . . . may not . . . , on the basis of

13

handicap[,] . . . [a]fford a qualified handicapped person an *opportunity to participate in* or benefit from the . . . service that is not equal to that afforded others." (emphasis added)); 45 C.F.R § 84.52(d)(1) ("A recipient . . . shall provide appropriate auxiliary aids . . . where necessary to afford such persons an *equal opportunity* to benefit from the service in question." (emphasis added)); McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1147 n. 8 (11th Cir. 2014) ("[A] showing that the auxiliary aids [a plaintiff] received to assist him in communicating were not sufficient to provide him with an equal *opportunity* to benefit from the healthcare provider's treatment is enough to establish a violation of both the RA and ADA."  (emphasis added)); Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 343 (11th Cir. 2012) ("[T]he proper inquiry is whether the auxiliary aid that a hospital provided to its hearing-impaired patient gave that patient an *equal opportunity to benefit from the hospital's treatment*." (emphasis added)).

There can be no question that the exchange of information between doctor and patient is part-and-parcel of healthcare services.  Thus, regardless of whether a patient ultimately receives the correct diagnosis or medically acceptable treatment, that patient has been denied the equal opportunity *to participate* in healthcare services whenever he or she cannot communicate medically relevant information effectively with medical staff.  It is not dispositive that the patient got the same

ultimate treatment that would have been obtained even if the patient were not deaf. See 45 C.F.R. § 84.4(b)(2) ("[A]ids, benefits, and services, to be equally effective, are *not required to produce the identical result or level of achievement* for handicapped and nonhandicapped persons, *but must afford handicapped persons equal opportunity to obtain the same result*, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." (emphasis added)).

Instead, what matters is whether the handicapped patient was afforded auxiliary aids sufficient to ensure a *level of communication* about medically relevant information substantially equal to that afforded to non-disabled patients. In other words, the ADA and RA focus on the communication itself, not on the downstream consequences of communication difficulties, which could be remote, attenuated, ambiguous, or fortuitous. For this reason, claims for ineffective communication are not equivalent to claims for medical malpractice.

2. Plaintiffs' Failure to Articulate What It Was That They Could Not Communicate

The district court also faulted Plaintiffs for failing to articulate, with the benefit of hindsight, what they did not understand or could not communicate. More specifically, Plaintiffs could not show that hospital staff was "unable to ascertain [Plaintiffs'] chief medical complaint, unable to create a treatment plan, or unable to help [Plaintiffs] understand [their] instructions under the treatment plan."

15

Doc. 133 at 30 (Silva); id. at 33-34 (Jebian).  The district court relied on medical records indicating that hospital staff were able to ascertain Plaintiffs' primary symptoms, and that Plaintiffs verbalized understanding of treatment and discharge instructions.  We reject this standard for two reasons.

First, limiting the required level of communication to that necessary to convey the primary symptoms, a treatment plan, and discharge instructions may still result in deaf patients receiving an unequal opportunity to participate in healthcare services in comparison to non-disabled patients.  When a hearing (i.e., non-disabled) person goes to the hospital, that person is not limited only to describing symptoms and receiving the treatment plan and discharge instructions.  The patient's conversation with the doctor could, and sometimes should, include a whole host of other topics, such as any prior medical conditions and history, medications the patient is taking, lifestyle and dietary habits, differential diagnoses, possible follow-up procedures and tests, informed-consent issues, and side effects and costs of potential courses of treatment.  Because a non-disabled person has the benefit of this expansive informational exchange, it is error to conclude on summary judgment that the mere successful communication of the primary symptoms, treatment plan, and discharge instructions is enough, as a matter of law, to preclude liability under the ADA and RA.

16

Second, the district court's requirement that Plaintiffs articulate exactly what they failed to understand is overly burdensome.  It would be exceedingly difficult for a deaf patient to recount a conversation he or she could not hear—just as it would be hard for blind patients to describe the contents of materials they could not read.  Thus, we reject a requirement that a disabled patient explain exactly what was poorly communicated when that patient could not know that information precisely because of the disability.

### 3. The Correct Standard—Impairing the Exchange of Medically Relevant Information

The proper inquiry under the ADA and RA is simply to examine whether the hospital provided the kind of auxiliary aid necessary to ensure that a deaf patient was not impaired in exchanging medically relevant information with hospital staff.  To be ineffective communication, it is sufficient if the patient experiences a real hindrance, because of her disability, which affects her ability to exchange material medical information with her health care providers.  This standard is consistent with the requirement that hospitals afford a *level of communication* to a deaf

patient about medically relevant information that is substantially equal to that afforded to non-disabled patients.[7]

That does not mean that deaf patients are entitled to an on-site interpreter every time they ask for it. See McCullum, 768 F.3d at 1147. "The regulations do not require healthcare providers to supply any and all auxiliary aids even if they are desired and demanded." Id. "[C]onstruing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid." Liese, 701 F.3d at 343. If effective communication under the circumstances is achievable with something less than an on-site interpreter, then the hospital is well within its ADA and RA obligations to rely on other alternatives. Indeed, the implementing regulations clarify that "the ultimate decision as to what measures to take rests with" the hospital. 28 C.F.R. § 36.303(c)(1)(ii). And further, "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with" several context-specific factors, including the "nature, length, and complexity of the communication involved; and the context in which the communication is taking place." Id. Thus, "the task of determining whether an

---

[7] Admittedly, perfect communication is not required under the ADA and RA. Cf. Bircoll v. Miami-Dade Cty, 480 F.3d 1072, 1086 (11th Cir. 2007) (holding that, under the ADA and RA, the quality of communication between a deaf arrestee and a police officer did not have to be "perfect" in order to put the deaf person "on equal footing" with non-disabled arrestees). However, the communication must still be effective.

entity subject to the RA has provided appropriate auxiliary aids where necessary is inherently fact-intensive." Liese, 701 F.3d at 342.

It is precisely because of this fact-intensive inquiry that an effective-communication claim often presents questions of fact precluding summary judgment. See Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 342-43 (11th Cir. 2012) (citing cases that conclude the effectiveness of the auxiliary aids is a "question of fact" inappropriate for summary judgment). "Nonetheless, this does not mean that every request for an auxiliary aid that is not granted precludes summary judgment or creates liability[.]" Id. at 343.

With this in mind, we proceed to evaluate the record evidence pertaining to whether there are disputed issues of material fact regarding Plaintiffs' claimed impairments in their ability to exchange medically relevant information with Defendants' hospital staff.

### B. The Evidence Is Sufficient to Overcome Summary Judgment

Examining the facts in the light most favorable to Plaintiffs, we conclude that Plaintiffs have offered sufficient evidence to defeat summary judgment.

#### 1. Silva's Claims Survive Summary Judgment

Silva has offered sufficient evidence for a rational jury to find that Defendants' failure to offer appropriate auxiliary communication aids impaired her

ability to exchange medically relevant information with hospital staff.  In her

sworn declaration, she addressed communication difficulties that arose from her

visits to Baptist's facilities:

> At each such hospitalization or visit, hospital staff would conduct tests, perform procedures, prescribe medication, and attempt to communicate with me regarding my condition and treatment options through my friends and family (none of who [sic] are fluent in ASL), written notes and gestures[;] [h]owever, *I was unable to understand most of what they attempted to communicate through these means*.

Doc. 61-13 at ¶ 8 (emphasis added).  She further explained that "[h]ospital staff

would also make me sign forms without explaining what I was signing, including

signing forms consenting to treatment and medications that *I did not fully*

*understand or even have the opportunity to ask questions about*."  Id. ¶ 9

(emphasis added).  And addressing the tendency of the VRI devices to

malfunction, Silva explained that "[o]n some occasions . . . the machine was

inoperable or unusable" and "it appeared that hospital staff could not figure out

how to operate the machine[;] [o]ther times, the picture would be blocked, frozen,

or degraded."  Id. ¶ 10.

Silva also highlighted specific instances of ineffective communication.  For

example, on January 4, 2011, Silva went to Baptist Hospital for stomach pain.  She

"requested an interpreter many times" and "wait[ed] for so long" before the

interpreter arrived.  Doc. 78-5 at 16-17.  While waiting for the live interpreter,

20

Silva communicated back and forth with handwritten notes—"an extremely frustrating experience" given "the type of terminology that doctors use." Id. at 17. On that occasion, until the delayed arrival of the live interpreter, Silva stated she "was not able to communicate at all." Id. This evidence of an impaired informational exchange is difficult to ignore.[8]

Further, on March 9, 2015, Silva went to Baptist Hospital for chest pains. The nurse turned on the VRI device but could not get it to function. As a result of the VRI machine's malfunction, Silva recounted:

> During this time, *I could not communicate with the hospital staff.* The nurses kept coming in and out of the room, they communicated with my dad and *I had no idea what they were saying.* I wanted to know what they were saying, *I couldn't explain how I felt* and I saw the nurses talking and *I didn't know if they were talking about me and it was something bad.*

Doc. 78-9 ¶ 16 (emphasis added). After more than an hour, the VRI did eventually become operational, and Silva used it to communicate until her live interpreter arrived. Nonetheless, a rational jury could find, after hearing about this incident,

---

[8] The Department of Justice (DOJ) published interpretive guidelines on its regulations implementing the ADA. See 28 C.F.R. pt. 36 App'x A. In those guidelines, the DOJ explained that the exchange of written notes is not appropriate "when the matter involves more complexity, such as in communication of medical history or diagnoses, in conversations about medical procedures and treatment decisions, or in communication of instructions for care at home or elsewhere." Id.

that Silva's ability to exchange medically relevant information with hospital staff was impaired.[9]

In addition to specific instances where Silva was unable to communicate effectively, there are other occasions where the malfunctioning of Defendants' VRI machines could generate a reasonable inference of an impaired informational exchange. For instance, on April 29, 2014, Silva went to SMH because of pregnancy complications—she was unable to detect fetal movement during her pregnancy. The staff attempted to set up the VRI, "[b]ut it wasn't working at all."[10] Doc. 78-5 at 32. More generally, Silva explained her frequent experience that "the [VRI] connection is not smooth[,] [i]t's not strong enough." Doc. 78-4 at 44. In a supplemental declaration, she stated:

> [E]ach time that I would go to both hospitals, the hospitals may bring in a VRI, but it would rarely work, and it would fail. Even some times when it would work at Baptist Hospital, it would freeze on me and there would be a huge lag time where it would seem like the interpreter was in slow motion.

---

[9] It is no answer to say that hospital staff relied on Silva's father to communicate effectively with Silva. ADA regulations expressly provide that a covered entity "shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication" except in narrow circumstances not applicable here. 28 C.F.R. § 36.303(c)(3). Thus, with some exceptions, reliance on a family member for interpretive assistance is not an adequate substitute for an appropriate auxiliary aid—in this case, the VRI machine—when it malfunctions.

[10] Consequently, Silva "demanded a live interpreter as soon as possible, because of the health of [her] baby and the crisis [she] felt [she] was in." Doc. 78-5 at 32-33. Hospital staff initially declined, asking for more time to set up the VRI. Eventually, after the delay of attempting to work the VRI device, the hospital team brought in a live interpreter for the visit.

Doc. 78-9 ¶ 38.

This is just one example and there are others: On May 9, 2011, Silva had an appendectomy at Baptist Hospital, but there is a fact issue as to whether the VRI worked then or worked only for 46 minutes for post-operation teaching and discharge. On May 20, 2011, Silva was admitted to Baptist Hospital for abdominal pain. Although the hospital's notes state that it fixed a "[n]etwork glitch" with the VRI and the machine was then "in working order," Doc. 59-1 at 232, Silva stated in her deposition that her boyfriend assisted her in communicating with staff and, further, the hospital's records of VRI usage do not show any usage by Silva on this date. On December 6, 2012, Silva went to Baptist Hospital for chest pains and testified that staff used the VRI "briefly," but VRI records again do not show any usage by Silva on this date. On March 4, 2013, Silva went to Baptist Hospital for shoulder pain, and she claims that the VRI worked for only a portion of that visit. On June 11-12, 2013, Silva went to Baptist Hospital for nausea and abdominal pain, but she claims that hospital staff only used the VRI machine for 10 minutes across a two-day visit. And in a July 2014 visit to SMH for abdominal pain and contractions, Silva stated in a declaration that she was provided with a VRI machine and "the VRI would not work." Doc. 61-13 ¶¶ 17-18.

A deaf person must rely on the slight and sophisticated hand movements of the interpreter depicted on the screen, so when the screen image is unclear or

23

becomes choppy, the message is disrupted.[11]  Thus, we view the instances of technological failures as corroborative evidence of Silva's assertions that she could not communicate effectively with hospital staff.[12]

In light of the above evidence, Silva's effective communication claims survive summary judgment.

### 2.  Jebian's Claims Survive Summary Judgment

Jebian submitted a sworn declaration stating that, during his hospital visits, he was "unable to understand most of what [medical staff] attempted to communicate" based on the failure to provide an in-person interpreter.  Doc. 61-14 ¶ 8.  Jebian also similarly recounted, in general terms, the unavailability of the VRI machines, either because the "hospital staff could not figure out how to operate the machine" or because the "video picture would freeze or break down."  Id. ¶ 10.  However, in addition to claiming that he was denied needed auxiliary aids as a patient, Jebian also alleged that Defendants denied him required auxiliary aids while accompanying his father to Baptist Hospital for treatment.  See 28 C.F.R.

---

[11] ADA regulations expressly provide that, when a covered entity "chooses to provide qualified interpreters via VRI service," it "shall ensure that it . . . delivers high-quality video images that do not produce lags, choppy, blurry or grainy images, or irregular pauses in communication."  28 C.F.R. § 36.303(f), (f)(1).  The VRI must also have "[a] sharply delineated image."  Id. § 36.303(f)(2).

[12] However, we recognize that there is also evidence that the VRI functioned properly and allowed Silva to effectively communicate with hospital staff during these visits to a Baptist facility: (1) November 29, 2010 visit to Baptist Hospital for stomach pain; (2) January 3, 2011 visit to Baptist Hospital for stomach pain; (3) May 19-20, 2014 visit to SMH for vomiting and fever; and a (4) July 6, 2014 visit to SMH for heartburn.

§ 36.303(c)(1) (extending the effective-communication obligation to "companions who are individuals with disabilities"). We conclude that Jebian offered sufficient evidence to overcome summary judgment for both his claims as a patient and as a companion.

Most of Jebian's problematic hospital visits occurred in his capacity as a patient. On July 11, 2012, Jebian presented at Baptist Hospital for pain in his chest. That visit generated a clinical report which contains a notation that Jebian's deafness "limited" the medical evaluation. Doc. 59-3 at 11. The district court dismissed this indicator of ineffective communication because the doctors were still able to document the "chief complaint," "onset of symptoms," "severity of condition," and other "information available in the outpatient context only through patient reporting" (such as insomnia and urinary output). Doc. 133 at 16-17. Moreover, Jebian "verbalized understanding" of his discharge instructions. Id. at 17 (internal quotation marks omitted). That, however, at most shows that Jebian's contention of ineffective communication is disputed by Defendants—but a disputed material fact goes to a jury. Further, as we have explained, evidence that the medical staff could ascertain a patient's basic symptoms and convey treatment instructions is not enough for us to conclude, as a matter of law, that a disabled patient's level of informational exchange was equal to that of non-disabled patients as required by the ADA and RA.

On July 15, 2012, Jebian presented at Baptist Hospital reporting symptoms of kidney stones. The pain was "excruciating." Doc. 78-7 at 25. The hospital staff attempted to set up the VRI device, but could not figure it out—they could not even figure out "how to plug it in."[13]  Id. at 26. When that did not work, the hospital relied on Jebian's father, who had accompanied him to the hospital, for interpretive assistance. But as we have already stated, absent certain narrow exceptions not applicable here, reliance on companions for communication assistance is not an "appropriate" auxiliary aid. 28 C.F.R. § 36.303(c)(2). A jury could thus infer that, with VRI unavailable and the hospital's unsanctioned reliance on Jebian's father for interpreting help, Jebian may have been impaired in communicating medically relevant information regarding his excruciating symptoms.

Similar problems occurred during Jebian's visit to one of Baptist's outpatient centers on March 11, 2014. On that occasion, Jebian arrived reporting sports-related injuries. Because Baptist does not have VRI machines at its outpatient facilities, the medical team there relied on Jebian's accompanying wife for interpretive assistance. (Again, ordinarily, reliance on a companion is improper under ADA regulations). When they discovered Jebian had a broken rib, they

---

[13] The ADA regulations expressly require covered entities that choose to use VRI machines to "ensure that [they] provide[] . . . [a]dequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 36.303(f), (f)(4).

26

transferred him to Baptist Hospital for emergency treatment where a VRI was used.  But, yet again, the VRI malfunctioned.  Jebian testified that the image quality was unclear, and "[t]he screen would black out."  Doc. 78-7 at 35.  Like with Silva, a jury could rationally infer that a deaf person—who must discern slight and sophisticated hand movements in order to understand a message on the screen—would be hindered in comprehending the message when the screen image is corrupted or unclear.

And on August 10, 2014, Jebian went to a Baptist outpatient center and then to Baptist Hospital for a muscle spasm.  Hospital staff told him an interpreter was coming and he "was so excited."  Doc. 59-2 at 109  Instead, hospital staff "brought the VRI in for the last five minutes" before he was discharged.  Id.

In addition, Jebian also offered at least one occasion where he could not communicate effectively as a companion to his father who was suffering a heart attack.  On November 5, 2010, the medical staff performed a surgical heart procedure on Jebian's father.  Despite the complexity and emotionality of those circumstances, hospital staff relied on Jebian's niece to communicate with Jebian.  Putting aside the fact that reliance on companions for interpretive assistance (absent some narrow exceptions) violates the command of ADA regulations, 28 C.F.R. § 36.303(c)(2), Jebian's niece—a family member of the heart-attack victim—was emotionally compromised, which may have interfered with her ability

27

to act as a translator between Jebian and hospital staff.  According to Jebian, "she wasn't even in the right mind to be able to do that," and she was "crying and grieving for her family member, so she was there to assist me as much as she possibly could."  Doc. 78-7 at 11.  A jury could hear this story and reasonably find that Jebian's ability to relate medically relevant information to and from hospital staff was impaired.

The district court correctly noted that Jebian was more consistent than Silva in refusing to accept the VRI even before hospital staff attempted to set up the device.  But he refused the VRI only after experiencing difficulties with the machine in the past.  As he recounts in his deposition: "It was all day long I had a bad experience with that VRI[;] [e]very staff member tried to get it going and nobody could."  Doc. 59-2 at 86.  For that reason, Jebian thereafter declined the VRI because he did not "even want to waste all that time" with a device that could—and as we know from others' testimony—often did malfunction.  Id.  We are thus unwilling to hold against Jebian his tendency to decline the VRI because a jury could conclude he acted reasonably in anticipating that the VRI would not facilitate effective communication.[14]

---

[14] We stress again that a patient is not entitled to an in-person interpreter in every situation, even if he or she asks for it.  See McCullum, 768 F.3d at 1147.  The hospital ultimately gets to decide, after consulting with the patient, what auxiliary aid to provide.  28 C.F.R. § 36.303(c)(1)(ii).  But whatever communication aid the hospital chooses to offer, the hospital must ensure effective communication with the patient.

In sum, both Silva and Jebian have demonstrated a genuine dispute of material fact on whether they could communicate effectively with medical staff at Defendants' facilities.  Summary judgment was thus improper.[15]

## III.    Defendants' Alternative Grounds for Affirmance

Defendants offer several alternative grounds to affirm the award of summary judgment.  First, Defendants ask us to affirm summary judgment as to the claims for compensatory damages on the ground that Plaintiffs failed to offer evidence of deliberate indifference.  To win monetary relief, Plaintiffs must prove that Defendants exhibited deliberate indifference.  See Liese, 701 F.3d at 345.  Under that standard, "a plaintiff must show that the defendant 'knew that harm to a federally protected right was substantially likely' and 'failed to act on that likelihood.'"  McCullum, 768 F.3d at 1147 (emphasis omitted) (quoting Liese, 701 F.3d at 344).

---

[15] The parties focused substantial attention on whether the VRI machines complied with certain technical requirements set forth in the ADA regulations.  For instance, Plaintiffs claim that Defendants failed to maintain a "dedicated" internet connection for its VRI machines.  28 C.F.R. § 303(f)(1) (requiring VRI devices to have a "*dedicated* high-speed, wide-bandwidth connection or wireless connection that delivers high-quality video images" (emphasis added)).  It is not necessary for us to delve into the intricacies of these technical arguments.  The touchstone of our inquiry is whether effective communication actually occurred.  See 42 U.S.C. § 12182(b)(1)(A)(i) (discrimination occurs when a disabled person suffers the "denial of the opportunity . . . to participate in or benefit from the" services); id. § 12182(b)(2)(A)(iii) (discrimination includes the denial of services "*because of* the absence of auxiliary aids and services" (emphasis added)).  Noncompliance with the technical performance standards for VRI machines is, by itself, not necessarily enough to make out an effective-communication claim.  What matters is the actual quality of the communication between the patient and hospital staff.

29

The district court did not address deliberate indifference—it resolved the case solely on the question whether the hospitals' auxiliary aids precluded effective communication. While we have the power to affirm a judgment on any basis supported by the record, the absence of any analysis by the district court on this issue makes it particularly difficult to make an informed decision on review. We therefore remand to the district court for an independent consideration of whether there exists a triable issue of fact on the deliberate-indifference issue.

Second, Defendants contend that some of Plaintiffs' hospital visits are time-barred because they occurred outside the limitations period for this lawsuit. Neither the ADA nor RA provides a statute of limitations, so we apply the most analogous state statute of limitations. See Everett v. Cobb Cty. Sch. Dist., 138 F.3d 1407, 1409 (11th Cir. 1998). The most analogous state limitations period comes from personal injury actions, id., which in Florida is a four-year period, Fla. Stat. § 95.11(3); see also City of Hialeah v. Rojas, 311 F.3d 1096, 1103 n.2 (11th Cir. 2002). Plaintiffs filed this lawsuit on May 16, 2014, so according to the district court and Defendants, any events occurring before May 16, 2010, are time-barred.

In opposing summary judgment below, Plaintiffs acknowledged that they "may not receive damages for [their] claims" arising out of hospital visits preceding the limitations period, but that these earlier visits are "relevant and

30

admissible" to show deliberate indifference. Doc. 79 at 11. We agree. Hospital visits occurring before the limitations period are not to be relied upon themselves as discrete claims of discrimination, but evidence of discrimination during those visits is relevant to whether the hospitals had the requisite knowledge to establish deliberate indifference during Plaintiffs' subsequent hospital visits, which did occur during the limitations period.[16] Thus, on remand, the district court should consider these earlier visits in deciding whether a genuine dispute of material fact exists with respect to Defendants' claimed deliberate indifference.

Third, Defendants argue that all claims against Baptist Health are improper because it is the parent organization to Baptist Hospital and SMH; it is not itself a medical facility at which Plaintiffs presented with medical needs. We reject this contention. There is no rule that a covered entity under the ADA or RA must be the direct service-provider—in fact the ADA addresses itself to those who own, lease, or operate a place of public accommodation. 42 U.S.C. § 12182(a). Baptist

---

[16] That evidence is also relevant to Plaintiffs' claim for a permanent injunction against Defendants' allegedly discriminatory policies. Unlike each hospital visit that involved an impaired informational exchange, which are discrete acts of alleged discrimination, Defendants' challenged *policies* may be part of an *ongoing* alleged violation. Under the "continuing violation doctrine," Plaintiffs may rely on hospital visits preceding the limitations period to support their theory that Baptist's policies and practices—which continued through the limitations period— were unlawful. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002) (differentiating discrete acts of discrimination from ongoing, continuing violations); Havens Realty Corp. v. Coleman, 455 U.S. 363, 380-81 (1982) (holding that, when a plaintiff challenges not just discrete acts as unlawful discrimination, but "an unlawful *practice* that continues into the limitations period," the continuing violation doctrine applies (emphasis added) (footnote omitted)).

31

Health owns and operates the hospitals at which Plaintiffs presented, it houses the network to which the VRI machines are connected, and applies its various policies and procedures to Baptist Hospital, SMH, and affiliated outpatient facilities. We thus decline to excuse Baptist Health from the lawsuit on this basis.

Fourth, Defendants contend that Silva, in particular, cannot rely on evidence of discrimination during hospital visits when she presented as a companion, rather than a patient. In her complaint, Silva (unlike Jebian) alleged discrimination only in her capacity as a patient, so the district court did not err in declining to consider evidence of discrimination while Silva was accompanying her daughter to the hospital for treatment. On appeal, Defendants ask us to ignore that evidence, and Plaintiffs offer no dispute in their reply brief. For that reason, our analysis has not relied on any hospital visits during which Silva claims she suffered discrimination as a companion.

## CONCLUSION

We REVERSE the district court's order granting summary judgments to Defendants and REMAND for further proceedings consistent with this opinion. Plaintiffs have Article III standing to proceed with their claims for injunctive relief. Plaintiffs have also offered sufficient evidence for a rational jury to conclude they could not communicate effectively with hospital staff due to their hearing

32

disabilities.  So, it was error to grant summary judgment to the hospitals on Plaintiffs' claims under the ADA and RA.  However, because the award of monetary damages requires a finding of deliberate indifference, we REMAND the claims for damages to the district court to consider whether summary judgment is proper in light of that question.