**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID UPDIKE,
*Plaintiff-Appellant*,

v.

MULTNOMAH COUNTY, a municipal
corporation; STATE OF OREGON,
*Defendants-Appellees*,

and

CITY OF GRESHAM,
*Defendant*.

No. 15-35254

D.C. No.
3:13-cv-01619-
SI

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted June 7, 2017
Portland, Oregon

Filed August 31, 2017

Before: A. Wallace Tashima, Ronald M. Gould,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Gould

# SUMMARY[*]

## Americans With Disabilities Act / Rehabilitation Act

The panel affirmed in part and reversed in part the district court's summary judgment orders, and remanded, in a case in which David Updike, who has been deaf since birth, alleged that the State of Oregon and Multnomah County did not provide him with an American Sign Language interpreter at his arraignment on criminal charges, and that the County did not provide him with an ASL interpreter and other auxiliary aids in order for Updike to effectively communicate while he was in pretrial detainment and under pretrial supervision, in violation of Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act.

The panel held that Updike lacks standing to pursue his claims for injunctive relief against the State because it is no more than speculation and conjecture that the State will not provide an ASL interpreter and auxiliary aids if Updike makes an appearance as a pretrial detainee again, and lacks standing to pursue his claims for injunctive relief against the County because the possibility of recurring injury remains speculative.

The panel affirmed the district court's summary judgment in favor of the State on Updike's claims under the ADA and § 504 because there is no evidence that the State's failure to provide an ASL interpreter was the result of deliberate indifference.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel reversed the district court's summary judgment in favor of the County on Updike's ADA and § 504 claims for damages. The panel held that a reasonable jury could find that the County was deliberately indifferent and violated Title II and § 504 when it did not conduct an informed assessment of Updike's accommodation needs and did not give primary deference to Updike's requests or context-specific consideration to his requests; and when County employees failed to provide Updike with an ASL interpreter in a multitude of interactions with County employees, did not offer use of a TTD, and did not turn on closed captioning.

## COUNSEL

Carl L. Post (argued), John Burgess, and Daniel Snyder, Law Offices of Daniel J. Snyder, Portland, Oregon, for Plaintiff-Appellant.

Jacqueline Kamins (argued), Assistant County Attorney; David N. Blankfeld, Multnomah County Attorney; Office of Multnomah County Attorney, Portland, Oregon; for Defendant-Appellee Multnomah County.

Peenesh Shah (argued), Assistant Attorney General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon Department of Justice, Salem, Oregon; for Defendant-Appellee State of Oregon.

**OPINION**

GOULD, Circuit Judge:

David Updike, who has been deaf since birth, uses American Sign Language ("ASL") as his primary language. He brings this action against Defendants the State of Oregon ("State") and Multnomah County ("County"), alleging that the State and the County did not provide him with an ASL interpreter at his arraignment on criminal charges, and that the County did not provide him with an ASL interpreter and other auxiliary aids in order for Updike to effectively communicate while he was in pretrial detainment and under pretrial supervision. Updike brings claims for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, and § 504 of the Rehabilitation Act, 42 U.S.C. §§ 701–796I, negligence, and false arrest. Updike appeals the district court's grant of summary judgment to Defendants on all claims. We affirm in part, reverse in part, and remand this case for further proceedings.

## I

### A

David Updike has been deaf since birth and communicates primarily through ASL, which is his native language and preferred method of communication. Updike does not consider himself to be bilingual in English and does not read or speak English well. Updike is not proficient at reading lips because he has never heard English words—in these circumstances, it is difficult to know the shape that lips make to produce certain words. All of Updike's friends are deaf and Updike's ex-wife is deaf. Updike explains that he "live[s] in the deaf world."

In the early afternoon of January 14, 2013, officers from the Gresham Police Department arrived at Updike's home to respond to a 911 call reporting a disturbance. The 911 caller told the operator that the disturbance[1] involved deaf individuals, but the officers did not bring an ASL interpreter with them. The officers arrested Updike and took him to Multnomah County Detention Center ("MCDC") for booking.

MCDC has a telecommunications device for the deaf ("TDD") available. MCDC staff, including corrections deputies and medical providers, can request an ASL interpreter as needed. The County has a contract with Columbia Language Services, Inc. to provide interpreting services, including "Interpretation for the Deaf," "Interpretation for the Deaf/After Hours," "Remote/Electronic Interpretation," "Interpreter [Services]/Normal Hours/ASL," and "Interpreter Services/After Hours/ASL."

At MCDC, Updike signed for an ASL interpreter and a teletypewriter ("TTY")[2] and tried to speak the word "interpreter," but was denied these requests. Instead, Officer Ozeroff showed Updike statements written by the other person involved in the disturbance and a witness, and wrote Updike a note asking Updike to write down what happened. Updike had trouble writing down what happened because written English is not his preferred form of communication. No ASL interpreter was provided.

---

[1] Updike explains that a deaf guest in his home assaulted him after he refused to give the guest money.

[2] TDD and TTY are used interchangeably by Updike and throughout this opinion.

At booking, a female corrections office removed Updike's handcuffs and spoke to Updike. Updike tried to read her lips and could not understand her statements. Deputy Kessinger, a booking deputy, completed Updike's intake. Updike was also photographed and fingerprinted. Updike requested an ASL interpreter during the booking process but was not given one.

After booking, Updike was placed in a holding room. Updike saw other inmates making telephone phone calls, and he wanted to call an attorney and his mother. He asked a corrections officer for a TTY, by saying "TTY," and motioned his hand to his ear to mime a telephone. The officer instructed Updike to sit down and gestured for Updike to sit down. Updike stated and signed "I need an interpreter," but the officer did not respond to this request. Updike then spoke the word "paper" and made a writing gesture. The officer denied the request for paper and a writing instrument, and told Updike to sit down.

After the booking process, Updike again asked to use a TTY by gesturing typing and by making a verbal request to a different corrections officer. The officer denied the requests and instructed Updike to sit down and wait.

Still at MCDC, Updike met with Nurse Nielsen and asked for an ASL interpreter. Updike wanted to communicate that officers hurt his neck and back during the course of his arrest, but the nurse did not request or provide an interpreter despite his request. The nurse pointed to questions on a health intake form, but Updike could not read the form very well and used body language to answer the questions the best he could. The nurse did not examine his neck and back, and Updike could not communicate that those areas hurt.

Updike met with Recognizance Officer Iwamoto from Multnomah County Pretrial Services Program. Updike had trouble reading the officer's lips and requested an ASL interpreter. The officer did not provide one. Updike also requested a TTY, but was not given one. Updike then learned that he would be held overnight and would appear in court the next day. Officer Iwamoto assured Updike that Iwamoto would notify the court that Updike would require an interpreter at his arraignment.

Officer Iwamoto's practice is to communicate with deaf people in custody by writing notes. Officer Iwamoto testified that if Updike was again arrested, he would likely not be given an ASL interpreter for his recognizance interview, and that he believed this practice needed to change. Iwamoto stated that he felt that written communication was sufficient to complete Updike's recognizance interview in order to make a release determination. Iwamoto's summary of his interview with Updike noted that the interview was conducted by writing, but that Updike would "need a sign language interpreter for court." This information became part of the court's records, and went to the judge, the district attorney's office, and the defense attorney. The information was also made available to pretrial release services. Iwamoto stated that he made this determination because arraignment occurred by video conference, and not because he himself had difficulties communicating with Updike by writing during the recognizance interview.

While at MCDC, Updike also met with Deputy Waggoner, a classification deputy. Waggoner's notes said that Updike was deaf; this notation was made so corrections staff could give Updike accommodations, including getting the TTD machine for Updike to make phone calls. However,

Deputy Waggoner did not call for an ASL interpreter during his triage interview with Updike because Waggoner did not think that Updike needed one and felt that Updike communicated fine using written English. Waggoner has never been trained on the necessary steps to obtain an interpreter for a deaf person during booking, and does not know how to get an ASL interpreter if he had trouble with a deaf inmate during a triage interview. Waggoner indicated in the Classification Summary Report that he believed Updike read fine, but also noted that Updike answered "yes" to the question asking whether Updike had a disability that would impact his ability to understand instructions while detained.

During Updike's time at MCDC, he was not given access to an ASL interpreter, a computer, a TTY, video relay services, or pen and paper. He could not call a lawyer or his family members without a TTY device. He was not able to watch television because there was no video relay service and no closed captioning.

On the evening of January 14, 2013, Updike was transferred to Multnomah County Inverness Jail ("MCIJ"). At MCIJ, an officer gave Updike a toothbrush, toothpaste, a comb, some blank paper and a pen, and a copy of MCIJ's Inmate Manual. Updike wrote to the officer that his neck and back hurt, and he requested pain medication, but no medical provider examined Updike.

Updike remained at MCIJ from January 14 through January 16, 2013. He made many requests for a TTY so he could make phone calls, as he saw that other inmates were freely able to use telephones during their free time. He was denied these requests. Updike also wrote a note requesting that an officer turn on closed captioning, but that request was not honored. MCIJ uses a loudspeaker system to address

inmates, but Updike did not hear any of the announcements made while at MCIJ.

On January 15, 2013, Updike appeared at his arraignment by video. MCIJ arranges arraignment by video, and inmates are not transported to court. During the arraignment, Updike could see but not read Judge Kathleen Dailey's lips and noticed that an interpreter was not in the courtroom. Upon learning that Updike was deaf, Judge Dailey postponed Updike's arraignment to the following day when an ASL interpreter would be available. Updike was thus held for another night at MCIJ.

The County's Pretrial Release Office conducts pretrial release interviews, including an assessment of the language needs of an individual, such as whether an individual needs an ASL interpreter, or whether the individual requires some other accommodation for hearing loss. This information is transmitted to the staff of the Oregon Judicial Department ("OJD") prior to arraignment. Updike's pretrial release documents received by OJD employees noted that Updike required an ASL interpreter. If staff do not determine whether an interpreter is required, the issue is not addressed until the court appearance. Typically, OJD staff prepare for arraignments by looking only at the booking register and not by reviewing the pretrial release report. But if a booking register notes a need for an accommodation, OJD staff would take appropriate action. At some time after Updike's arraignment, the County modified the format of the booking register so that the booking register notifies the court of a need for an accommodation. As a result of this change, OJD staff are now alerted that a person needs an ASL interpreter or a foreign language interpreter through the booking register.

On January 16, 2013, Updike again appeared in court by videoconference. An ASL interpreter was provided for Updike, and Updike was released that day. Updike again requested a corrections officer to supply him with a TTY so he could call for his daughter to pick him. He received a TTY for the first time, and left jail late that evening.

On January 17, 2013, Updike reported to pretrial supervision as ordered by Judge Dailey. Updike met with Michale Sacomano, a case manager for the Multnomah County Department of Community Justice's Pretrial Services Program. Sacomano conducted intake by written communication, despite the fact that Updike did not agree to conduct intake by writing and had requested—by both signing and speaking—an ASL interpreter and signed requesting an ASL interpreter. Sacomano denied the request, and explained that Updike should write all of his requests.[3] Updike had a series of miscommunications with Sacomano, and felt that Sacomano believed Updike used his hearing impairment as an excuse to violate conditions of his pretrial release.[4]

---

[3] Sacomano disputes whether Updike requested an ASL interpreter at this meeting. Because this is an appeal from the grant of summary judgment to Defendants, we construe the facts in the light most favorable to Updike as the non-moving party. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

[4] Sacomano's log entries noted that Updike's case was dismissed, that Updike had poor reporting during his time with pretrial services, that Updike used his hearing impairment as the reason for not complying with the conditions of supervision, and that their interactions were challenging because Updike "argued" everything. The "hearing impaired, learning impaired, and developmentally disabled individuals engage in a range of coping mechanisms that can give the false impression of uncooperative behavior or lack of remorse." *Armstrong v.*

The trial on Updike's criminal charge was postponed until April 22, 2013. After the jury was impaneled, the district attorney moved for dismissal.

**B**

On September 13, 2013, Updike filed his complaint, alleging claims against the City of Gresham, Multnomah County, and the State of Oregon. In early 2014, the City of Gresham settled. On June 1, 2014, Updike filed his first amended complaint. Updike brought several claims: ADA discrimination claims against the State and the County, violations of § 504 of the Rehabilitation Act against the State and the County, common law negligence against the State and the County, and false arrest against the County. He sought compensatory damages, injunctive relief, and attorneys' fees and costs.

The State filed its motion for summary judgment on April 23, 2014, which the district court granted on October 15, 2014. The County filed its motion for summary judgment on November 26, 2014, which the district court granted on March 24, 2015. The district entered final judgment on March 24, 2015.

Updike timely appealed. He does not challenge the grant of summary judgment on his negligence and false arrest claims.

---

*Davis*, 275 F.3d 849, 867 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005). As a result, it is likely that such individuals may have difficulty interacting with personnel who supervise them. *Id.* This is one basis that may explain why the interactions between Sacomano and Updike were challenging.

## II

We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's grant of summary judgment. *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 648 (9th Cir. 2016). On review, we determine—viewing the evidence in the light most favorable to Updike, the non-moving party—whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004); *see* Fed. R. Civ. P. 56. "Summary judgment is improper if 'there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Simo v. Union of Needletrades, Indus. & Textile Emps.*, 322 F.3d 602, 610 (9th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). We review de novo the district court's decision regarding standing. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 902 (9th Cir. 2002).

## III

Article III of the Constitution limits federal courts to hearing only cases and controversies. To establish standing to sue, a plaintiff must show: (1) an injury that is concrete and particularized and actual or imminent; (2) a causal connection between the injury and defendant's challenged action; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Apart from this, standing for injunctive relief requires that a plaintiff show a "real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 107–08 (1983).

The parties do not dispute that Updike satisfies the general standing requirements of Article III,[5] but instead dispute whether Updike has shown a real and immediate threat that the injury will be repeated—which is necessary for standing to seek injunctive relief.

## A

Updike offers no evidence of a "real or immediate threat" that he would be "wronged again" by way of the State's failure to provide an ASL interpreter at future court appearances. *Lyons*, 461 U.S. at 111. Evidence in the record further indicates that this wrongful conduct will likely not occur again, given that information about necessary accommodations are now noted in the booking registers—the documents relied upon by OJD to set hearing dates—rather than the pretrial release reports.

Updike has not met his burden of showing that the State's allegedly wrongful behavior will likely recur. Moreover, Updike's evidence is insufficient to establish that any such wrongful behavior is likely to recur against him, *i.e.*, that he is likely again to be a pretrial detainee. Updike lacks standing to pursue his claims for injunctive relief against the State because it is no more than speculation and conjecture that the State will not provide an ASL interpreter

---

[5] Nor could the County or State really dispute this: The State and County's alleged failure to provide Updike with an ASL interpreter or the use of auxiliary services constitute concrete and particularized injuries sufficient to satisfy Article III. Further, Updike's inability to effectively communicate with corrections staff or even communicate at all with his lawyer or family was caused by the Defendants' failure to provide him with accommodation and meaningful access. Finally, a decision favorable to Updike would redress his injuries. *See Lujan*, 605 U.S. at 560–61.

and auxiliary aids if Updike makes an appearance as a pretrial detainee again.  *See id.* at 103, 107–08.

**B**

Although certain facts slightly alter our calculus in considering the threat of future harm from the County, we also hold that the possibility of recurring injury remains speculative such that Updike also lacks standing to pursue injunctive relief against the County.

Updike has been booked at MCDC on five previous occasions, and avers that he had been held overnight in a Multnomah County detention facility before and was then denied an ASL interpreter and a TTY although he requested auxiliary aids and services.  Record evidence also shows that a County officer had communicated with other deaf people in custody by writing notes, and that another County officer admitted to now knowing *how* to get an ASL interpreter if he had difficulties communicating with a deaf inmate.

Although "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," *O'Shea*, 414 U.S. at 496, "past wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy," *Lyons*, 461 U.S. at 103. Updike's past injury is insufficient to establish that the risk of recurring injury is more than speculative.  He has not identified specific County policies and practices that would subject Updike to a realistic possibility that the County would subject him to the injurious acts again in the future. *Compare id.* at 108–110 (holding that the plaintiff did not have standing because it was no more than conjecture that he would be subject to another unconstitutional chokehold in the future), *with Armstrong v. Davis*, 275 F.3d 849, 864 (9th Cir. 2001) (explaining that the California Board of

Prison Term's consistent practice of denying appropriate accommodations warranted holding that the plaintiff class established standing), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005). Further counseling against standing for injunctive relief is the assumption that Updike will likely conform his activities within the law such that he would not be arrested and detained in the future. *See O'Shea*, 414 U.S. at 497 ("We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners."). Updike has not shown "there is 'sufficient immediacy and reality' to [his] allegations of future injury to warrant invocation" of jurisdiction. *Id.*

In sum, Updike does not have standing to pursue his claims for injunctive relief against the State and County. We turn next to the merits of his claims for compensatory damages.

**IV**

**A**

Updike challenges the district court's grant of summary judgment in favor of the State and the County on his ADA and § 504 claims.

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)&(2). Title II of the ADA provides:

> [N]o qualified individual with a disability
> shall, by reason of such disability, be
> excluded from participation in or be denied
> the benefits of the services, programs, or
> activities of a public entity, or be subjected to
> discrimination by any such entity.

*Id.* § 12132. To prove that a public program or service violated Title II of the ADA, Updike must show that: "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g en banc* (Oct. 11, 2001). This provision extends to discrimination against inmates detained in a county jail. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (concluding that "[s]tate prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" (quoting 42 U.S.C. § 12131(1)(B))).

"Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act." *Duvall*, 260 F.3d at 1135. Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a
> disability . . . shall, solely by reason of her or
> his disability, be excluded from the
> participation in, be denied the benefits of, or
> be subjected to discrimination under any

> program or activity receiving Federal
> financial assistance . . . .

29 U.S.C. § 794.  To bring a § 504 claim, Updike must show that "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *Duvall*, 260 F.3d at 1135.

Title II and § 504 include an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities.  *See id.* at 1136; *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 266–67 (D.D.C. 2015) (citing 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.130(b)(1)(ii)), *reconsideration denied*, 146 F. Supp. 3d 197 (D.D.C. 2015).

As to persons with a hearing disability, implementing regulations for Title II provide that a public entity must "take appropriate steps to ensure that communications" with disabled persons "are as effective as communications with others."  28 C.F.R. § 35.160(a).  These regulations, squarely on point here, provide:

> (b) (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.
>
> (2) The type of auxiliary aid or service necessary to ensure effective communication

will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

*Id.* § 35.160(b). For deaf and hearing-impaired persons, auxiliary aids and services include:

Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective

> methods of making aurally delivered
> information available to individuals who are
> deaf or hard of hearing[.]

*Id.* § 35.104(1).

The Appendix to the ADA regulations also makes clear that the public entity has a duty to ensure effective communications and establishes a required deference that must normally be given to a disabled person's personal choice of aid and service:

> The public entity shall honor the choice [of
> the individual with a disability] unless it can
> demonstrate that another effective means of
> communication exists or that use of the
> means chosen would not be required under
> § 35.164. Deference to the request of the
> individual with a disability is desirable
> because of the range of disabilities, the
> variety of auxiliary aids and services, and
> different circumstances requiring effective
> communication.

*Id.* pt. 35, App. A (alteration in original) (quoting 28 C.F.R. pt. 35, App. A (2009)). The Appendix goes on to explain that "the type of auxiliary aid or service necessary to ensure effective communication will vary with the situation." *Id.* These regulations "require effective communication in courts, jails, prisons, and with law enforcement officers." *Id.*

One limitation on this duty, however, provides that a public entity is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." *Id.* § 35.164; *see also id.* pt.

35, App. A.  Yet the mere payment for an ASL interpreter and the payment for a TTY or similar device cannot be considered an undue burden.

Under both Title II of the ADA and § 504 of the Rehabilitation Act, Updike must show that he was excluded from participating in or denied the benefits of a program's services or otherwise discriminated against. "[C]ompensatory damages are not available under Title II or § 504 absent a showing of discriminatory intent." *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998), *as amended* (Oct. 8, 1998); *see Duvall*, 260 F.3d at 1138.  To show intentional discrimination, this circuit requires that the plaintiff show that a defendant acted with "deliberate indifference," which requires "both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood." *Duvall*, 260 F.3d at 1139.  "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id.*  To meet the second prong, the entity's failure to act "must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.*

A public entity may be liable for damages under Title II of the ADA or § 504 of the Rehabilitation Act "if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Mark H. v. Lemahieu*, 513 F.3d 922, 937–38 (9th Cir. 2008).  The "failure to provide reasonable accommodation can constitute discrimination." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).  A public

entity may not disregard the plight and distress of a disabled individual.

The parties do not dispute that Updike is a qualified individual with a disability and that, as a detainee at the detention facility, he was otherwise qualified to receive the services and benefits of the public entity. Instead, the parties dispute whether Updike was intentionally discriminated against when his requested accommodations were denied or when accommodation was not provided. Because Updike's ADA and § 504 claims do not differ in any respect relevant to resolving this appeal, and no party asserts that any distinctions are material, we address the ADA and § 504 claims together. *See Duvall*, 260 F.3d at 1135–36.

## B

The thrust of Updike's allegations against the State is that the State failed to arrange for an ASL interpreter at Updike's first criminal court appearance. As a result, Updike had to stay at MCIJ for an additional evening, and he complains that he could have been released earlier if an ASL interpreter had been provided on January 15, 2013, the date of his first arraignment hearing. The district court concluded that Updike did not show that the State acted with deliberate indifference. The State gave evidence that in setting Updike's arraignment, it reviewed the booking register, which did not note his need for an interpreter, but not the pretrial release report, which did note Updike's need for an interpreter.

Updike relies on *Robertson v. Las Animas County Sheriff's Department*, 500 F.3d 1185, 1199 (10th Cir. 2007) and *Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001) to argue that he was denied the ability to participate at the January 15, 2013 arraignment. Both cases involved deaf

or hearing impaired individuals who made court appearances without ASL interpreters. But neither out-of-circuit case discussed our circuit's heightened requirement for a plaintiff to establish that the discrimination was committed with deliberate indifference in order to recover monetary damages under the ADA or § 504. *See Duvall*, 260 F.3d at 1138–39. We have explained deliberate indifference as follows:

> Because in some instances events may be attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction, we have stated that deliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course. Rather, in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness.

*Id.* at 1139.

We conclude that the district court correctly granted summary judgment for the State on this issue. This case reflects an absence of effective communication and coordination between the County's pretrial services and employees at OJD about the need for an interpreter at Updike's arraignment. While it is regrettable that it appears that Updike spent an extra night in jail that he likely would not have had to spend had he been provided an ASL interpreter the first time he appeared before Judge Dailey, there is no evidence that the State deliberately failed to order

an interpreter at the January 15, 2013 arraignment. Instead, the evidence shows "bureaucratic slippage that constitutes negligence rather than deliberate action or inaction." *Id.* Since Updike's first arraignment, the County and State have reviewed their procedures and taken the appropriate corrective action, such that this "bureaucratic slippage" is likely to be avoided in the future. Similarly, pretrial services has modified their procedures such that the booking register now provides the necessary notice for accommodations.

There is no evidence that the State's failure to provide an ASL interpreter was the result of deliberate indifference. We accordingly affirm the district court's holding that summary judgment in favor of the State is appropriate on Updike's claims under the ADA and § 504.

## C

Along with alleging that the County failed to arrange for an ASL interpreter at Updike's arraignment, Updike alleges that the County did not provide him with an ASL interpreter and other auxiliary aids in order to effectively communicate while he was in pretrial detainment and under pretrial supervision. The district court held that Updike could have, but did not, provide the County notice of this conduct that allegedly violated the ADA and § 504 and that summary judgment was warranted on this ground. The district court, however, went on to review Updike's allegations and found that there was no evidence in the record creating a genuine issue as to whether the County intentionally violated the ADA or the Rehabilitation Act. As to Updike's ADA and § 504 claims for damages against the County, we reverse.

**1**

"Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, (2002)). "[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

The district court found that Updike raised several specific factual allegations in his declaration opposing the County's motion for summary judgment, submitted after the close of discovery, that were not previously raised in his complaint, including:

> Plaintiff's requests: (1) for an auxiliary aid to make telephone calls; (2) for an ASL interpreter to speak with Nurse Julie Nielson; (3) for closed captioning to be turned on for the [j]ail televisions; and (4) for an ASL interpreter for his meetings with pre-trial services.

The district court concluded that Updike's failure to provide the County with adequate notice of additional allegations warranted summary judgment on Updike's ADA and § 504 claims on these allegations.

We disagree. Although the primary focus of Updike's complaint was on the ASL interpreter that was not provided at his arraignment on January 15, 2013, Updike's complaint gave sufficient factual allegations describing the County's failure to provide auxiliary aids and services while Updike

was detained and under pretrial supervision to put the County on notice that those inactions would be at issue. For example, Updike's complaint stated that while Updike was at MCDC he requested an ASL interpreter and a TTY but neither was provided. He further alleged that he was directed to write a statement without the accommodations of a TTY or an ASL interpreter. The complaint went on to allege that the County did not provide Updike with an ASL interpreter while he was held at MCIJ.

His complaint also alleged that while he awaited trial, he was under the supervision of employees of the County. He had requested an ASL interpreter to aid his communication, but the County did not accommodate this request. Updike repeated these allegations throughout his complaint:

> Defendant County denied Plaintiff the benefits of Defendant's services and programs through failure to provide an ASL interpreter and failure to promptly provide a TTD while Plaintiff was in custody. Defendant County also failed to provide an ASL interpreter during Plaintiff's pretrial release while he was under the supervision of Defendant County's employees.

The complaint specifically alleged that the County denied Updike "effective communication by refusing to provide him with a qualified interpreter in circumstances involving the following types of communication which would be normal in criminal investigations and the arrest of a suspect." These circumstances included:

> explaining to the police the details of the incident and the alleged crime; discussing injuries; discussing damage to and loss of

personal property; conveying and understanding one's rights as a crime victim; conveying and understanding one's rights as an arrestee and pretrial detainee; asserting the right to effective communication during booking and being held by a jail or correctional facility; asserting the right to an ASL interpreter for appearances in court; and asserting the right to effective communication with supervising County employees during pretrial release.

Updike complied with the notice pleading requirement of Federal Rule of Civil Procedure 8. Updike alleged sufficient facts that the County did not accommodate his requests for an auxiliary aid to make telephone calls or for an ASL interpreter while in custody, such that the County should have been "on notice of the evidence it need[ed] to adduce in order to defend against [Updike's] allegations." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). Coupled with Updike's deposition testimony, the County was put on notice of the evidence it would need to defend against Updike's ADA and Rehabilitation Act claims. *See id.*

**2**

The district court also granted summary judgment on the alternative ground that there was insufficient evidence of intentional discrimination by the County against Updike.

The County argues that not providing Updike with his preferred form of communication is not, by itself, a violation of the ADA or the Rehabilitation Act. The County emphasizes that each of the County employees believed Updike could effectively communicate without the use of an

ASL interpreter or TTD/TTY device.  Whether Updike could effectively communicate in English is disputed as Updike avers that ASL is his primary language, he does not consider himself to be bilingual in English, he does not read or speak English well, and he is not proficient at reading lips. He contends that he was not able to communicate effectively with correctional staff because they did not provide appropriate accommodations.  Other disputes central to this case include whether the County undertook "a fact-specific investigation to determine what constitutes a reasonable accommodation," *Duvall*, 260 F.3d at 1139, and gave "primary consideration" to Updike's requests, 28 C.F.R. § 35.160(b)(2).

It is well-settled that Title II and § 504 "create a duty to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary." *Duvall*, 260 F.3d at 1139 (alteration in original) (quoting *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999)).  Thus, a public entity "must consider the particular individual's need when conducting its investigation into what accommodations are reasonable." *Id.*  As explained above, to meet the deliberate indifference test for compensatory damages, the public entity must be on notice that an accommodation is required, and that the entity's failure to act involved an element of deliberateness.  *Id.*  A denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference.  *See id.* at 1140 ("[Plaintiff] provided sufficient evidence to create a triable issue as to whether [defendants] . . . had notice of his need for the accommodation involved and that they failed despite repeated requests to take the necessary action.").  Here, there is no dispute that County employees were aware of Updike's disability.  There is also no record evidence that the County

properly investigated Updike's need for accommodation. We reverse the district court's grant of summary judgment on the ground that the County's failure to provide accommodations proceeded without conducting an adequate investigation of Updike's disability and the efficacy of other ways to communicate.

We also reverse the district court's grant of summary judgment on the ground that there are disputed issues of material fact as to whether, at each of Updike's requests for accommodation, the County's failure to provide an accommodation was done with deliberate indifference, rather than merely negligence.**[6]**

These are the individual bases for Updike's ADA and § 504 claims:

**Failure to provide an ASL interpreter or TTY during the booking process:** During the booking process, Updike requested an ASL interpreter and also requested a TTY device so he could make phone calls to his attorney and his mother. The district court dismissed this aspect of Updike's

---

**[6]** Updike also contends that an inmate with a communication-related disability "often lacks the ability to communicate his need for accommodation." *See, e.g.*, *Pierce*, 128 F. Supp. 3d at 269 ("[Defendant] does not explain how inmates with known communications-related difficulties (such as [Plaintiff]) are supposed to communicate a need for accommodations, or, for that matter, why the protections of Section 504 and Title II should be construed to be unavailable to such disabled persons unless they somehow manage to overcome their communications-related disability sufficiently enough to convey their need for accommodations effectively."). Our case law is clear on this point: there may be situations where a public entity's duty to look into and provide a reasonable accommodation may be triggered when "the need for accommodation is obvious," and the public entity is on notice about a need for accommodation. *Duvall*, 260 F.3d at 1139.

claim, explaining that Updike did not explain how the booking process would have been different in any material respect had he been provided with his preferred accommodation. This analysis, however, disregards the County's affirmative obligations to provide reasonable accommodations. Employees for the County were aware that Updike was deaf, and that Updike had requested an ASL interpreter and other auxiliary services. Furthermore, the County has a contract with Columbia Language Services for interpreting services. Taken together, a reasonable trier of fact could conclude that the County acted with deliberate indifference in denying a reasonable accommodation. *See id.* at 1136; *Wong*, 192 F.3d at 819 (explaining that the denial of a request for accommodation "without consulting [plaintiff] or any person at the University whose job it was to formulate appropriate accommodations" was "a conspicuous failure to carry out the obligation 'conscientiously' to explore possible accommodations"). A reasonable jury could conclude that an accommodation, such as an ASL interpreter or use of a TTY, was necessary for effective communication during the booking process.

**Failure to provide a TTD to make phone calls:** Updike made many requests for corrections staff to provide him with a TTD or TTY device so he could call his mother or an attorney but avers that no such aid was ever provided. As the district court noted, the parties do not dispute that a TTY machine was available for inmates to use for telephone calls, and that Updike was never provided with a TTY machine until after the January 16, 2013 arraignment when he was released from custody. The district court reasoned that Updike failed to present any evidence that the County actually refused to provide him with a TTY machine. We disagree with the district court's conclusion that the County did not act with deliberate indifference in denying the

request for a TTD or TTY. That Updike repeatedly requested a TTD, which was physically available at the jail, but was never provided such a device to assist making phone calls is evidence that the County denied him use of a TTD, creating a genuine issue of material fact on this issue. A trier of fact could conclude that the County acted with deliberate indifference in denying direct requests for this accommodation, which would permit Updike to use telephones, a service routinely made available to non-deaf inmates.

**Failure to turn on closed captioning on jail televisions:** Updike asked MCDC officials to turn on closed captioning several times while in the custody of the County, but avers this request was not accommodated. Although the district court attributed this to an "unintentional oversight," Updike has introduced evidence that County jail employees were aware of Updike's disability, yet ignored his repeated requests to turn on closed captioning. Again, there is a genuine factual dispute on deliberate indifference.

**Failure to provide an ASL interpreter during his medical evaluation:** Under Updike's evidence, which should be credited on summary judgment, Updike requested an ASL interpreter while meeting with Nurse Nielsen, and could not convey that he had neck and back pain because of an inability to communicate. He also explained that he could not read well the form the nurse used and that he could not respond or give input. Although the County asserts that Updike was very literate, and that an accommodation through writing was sufficient to comply with the ADA, the County has not put forth evidence showing that it looked into whether his request for accommodation could be granted without undue burden. Further, Updike disputes that the method of communication through writing was effective.

The district court dismissed this claim because there was no evidence in the record that Updike was denied any specific benefit or service that is regularly offered to other inmates. The lack of an ASL translator, however, may have denied Updike the opportunity to communicate effectively during the medical evaluation provided by the County. Medical evaluations often will be the type of complex and lengthy situation in which an ASL interpreter should be provided. *See Duffy v. Riveland*, 98 F.3d 447, 456 (9th Cir. 1996) ("[A] qualified interpreter may be necessary when the information being communicated is complex, or is exchanged for a lengthy period of time." (quoting 28 C.F.R. pt. 35, App.); 28 C.F.R. § 35.160(b)(2) ("The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place."). A trier of fact can weigh these factors in deciding whether written communication, rather than an ASL translator, was an appropriate accommodation.

**Failure to provide an ASL interpreter during the recognizance interview:** During Updike's recognizance interview, he requested an ASL interpreter and a TTY device, was not given either, and Updike said that he had difficulty reading the officer's lips. Officer Iwamoto disputed this, believing that he was able to communicate effectively with Updike through written English and that Updike communicated clearly through written notes. But again, the County introduced no evidence that it ascertained what accommodations might be needed, and instead relies on self-serving observations that its employees believed they were effectively communicating with Updike. Whether the County's accommodation was sufficient requires sifting

through a number of facts. *See* 28 C.F.R. § 35.160(b)(2). And here too, a reasonable jury could conclude that written communication was not adequate to ensure that Updike could communicate as effectively as non-hearing-impaired individuals or that the County provided the appropriate accommodation.

**Failure to provide an ASL interpreter and other auxiliary aids during interactions with pretrial services:** Updike and Sacomano dispute whether Updike requested an interpreter. Although the record shows that Sacomano was aware that Updike is deaf, the County did not put forward evidence that she looked into providing Updike with an ASL interpreter during their meetings. The district court focused on whether Updike was actually denied services or whether his interactions "actually caused him harm" in dismissing this aspect of Updike's claim. The district court should have instead focused on whether Updike could effectively communicate with Sacomano while under supervision of the County and whether the County gave Updike reasonable accommodations. Considering the evidence in the light most favorable to Updike, a reasonable jury could conclude that Sacomano did not adequately address Updike's need for accommodation.

**Failure to timely arrange for an ASL interpreter at arraignment:** Updike inquired with County staff whether an ASL interpreter would be available at arraignment, yet no interpreter appeared at his January 15, 2013 arraignment. The County, however, timely communicated Updike's need for an ASL interpreter before his January 15 arraignment by noting it in his pretrial release report. That OJD staff looked at the booking register but not the pretrial release report in setting calendar, does not show that the County was deliberately indifferent to Updike's need for an ASL

interpreter. As discussed earlier, this sequence of events shows "bureaucratic slippage that constitutes negligence rather than deliberate action or inaction." *Duvall*, 260 F.3d at 1139. Summary judgment was appropriate on this facet of Updike's claim.

*   *   *

The County's employees knew that Updike was deaf but did not provide Updike with an ASL interpreter, TTY device, or closed captioning for television, despite his repeated requests for these accommodations. Updike put forth evidence that he made repeated requests for an ASL translator and other auxiliary services with respect to various aspects of his time in custody and under pretrial supervision. The County was also on notice that Updike believed that his disability would impact his ability to understand instructions while detained. Updike contends that the County's failure to provide auxiliary aids and services limited his ability to communicate effectively, speak with his attorney and family members, and enjoy other programs and services on par with non-hearing impaired inmates.

Updike disputes the County's assertion that he was able to communicate fine using pen and paper, and instead contends that communication between him and corrections staff during the course of his detention and supervision were ineffective. Even if a jury ultimately determines that the County is correct—a matter that must be left to the jury where, as here, there are disputes of material fact—summary judgment was improper because the County never meaningfully assessed Updike's limitations and comprehension abilities. At no time was Updike assessed to determine to what extent he would need accommodation to ensure that he could communicate effectively with others during his time in custody and under pretrial supervision.

Yet "[w]hen an entity is on notice of the need for accommodation, it 'is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation.'" *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1207 (9th Cir. 2016) (quoting *Duvall*, 260 F.3d at 1139). Nor did the County present evidence that it engaged in any inquiry as to why an ASL interpreter or TTY would be unreasonable or could not be accommodated.[7] The record sets forth that it was not until his January 16, 2013 arraignment that Updike was provided with an ASL interpreter, and that it was not until Updike was released from custody that he was provided with a TTD. For these reasons, the district court erred in granting summary judgment in favor of the County on Updike's ADA and § 504 claims.

The district court, in granting summary judgment in favor of the County, concluded that Updike was not actually excluded from services that similarly-situated non-deaf individuals also accessed. We emphasize, however, that a public entity can be liable for damages under Title II and § 504 if it intentionally or with deliberate indifferences does not provide a reasonable accommodation to a deaf or hearing-impaired person. *See Duvall*, 260 F.3d 1138–39; *Mark H.*, 513 F.3d at 938.

In reversing the grant of summary judgment in favor of the County on Updike's claims for damages, we do not hold that Updike necessarily was entitled to have an ASL

---

[7] The County makes no argument that providing Updike with an interpreter or providing other auxiliary services, such as a TTD, would have been unduly burdensome. Nor would this argument have much weight, given their existing contract with Columbia Language Services to provide those in custody with ASL interpreter services.

interpreter as a matter of course to achieve effective communication with County employees or that the County should be subject to liability for failing to provide one. However, whether the County provided appropriate auxiliary aids where necessary is a fact-intensive exercise. Upon notice of the need for an accommodation, a public entity must investigate what constitutes a reasonable accommodation. *See Duvall*, 260 F.3d at 1139. Regulations require that public entities give primary consideration to the requests of the deaf individual with respect to auxiliary aid requests and give deference to such requests. 28 C.F.R. § 35.160(b)(2). And the type of auxiliary aid or service that will be appropriate should take into account the context in which the communication is taking place. *Id.* If the public entity does not defer to the deaf individual's request, then the burden is on the entity to demonstrate that another effective means of communication exists or that the requested auxiliary aid would otherwise not be required. *See* 28 C.F.R. pt. 35, App. A. A public entity must "take appropriate steps to ensure that communications" with a person with a disability is "as effective as communications with others." *Id.* § 35.160(a)(1). To deny a deaf person an ASL interpreter, when ASL is their primary language, is akin to denying a Spanish interpreter to a person who speaks Spanish as their primary language. An ASL interpreter will often be necessary to ensure communication with a deaf person who has become enmeshed in the criminal justice system. At a minimum, officials must conduct an adequate investigation into what accommodations may be necessary to permit effective communication of the deaf while incarcerated.

In this case, a reasonable jury could find that the County was deliberately indifferent and violated Title II and § 504 when it did not conduct an informed assessment of Updike's

accommodation needs, when it did not give primary deference to Updike's requests or context-specific consideration to his requests, when County employees failed to provide Updike with an ASL interpreter in a multitude of interactions with County employees, when County employees did not offer use of a TTD, and when County employees did not turn on closed captioning. Thus, we reverse the district court's holding that no evidence in the record created a genuine issue of material fact on whether the County violated the ADA or the Rehabilitation Act by inaction and conduct undertaken with deliberate indifference to Updike's legitimate needs as a deaf individual. Stated another way, the County may not turn a blind eye to a deaf ear. Whether it has done so here cannot be resolved at this stage of the proceedings before the consideration of relevant testimony and other evidence that may be offered at trial, and before a jury or the district court has made findings of fact based on trial proceedings. We reverse the grant of summary judgment in favor of the County on Updike's compensatory claims under Title II of the ADA and § 504 of the Rehabilitation Act. On the genuine factual disputes that we have identified, the case should proceed to trial.

## V

We affirm in part and reverse in part the district court's summary judgment orders. We affirm the district court's grant of summary judgment in favor of the State. We also affirm the district court's conclusion that Updike lacks standing to pursue his claims for injunctive relief. We reverse the district court's grant of summary judgment in favor of the County on Updike's ADA and § 504 claims for compensatory damages. We remand the case for further proceedings consistent with this opinion.

**AFFIRMED in part; REVERSED in part; and REMANDED.** Each party shall bear its own costs on appeal of the summary judgment order entered in favor of the State. We award costs to Updike on appeal of the summary judgment order entered in favor of the County.