FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

OCT 18 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| MARK BAX; LUCIA PERSHE BAX, <br><br> Plaintiffs-Appellants, <br><br> and <br><br> MARY BIRMINGHAM, <br><br> Plaintiff, <br><br> v. <br><br> DOCTORS MEDICAL CENTER OF MODESTO, INC., <br><br> Defendant-Appellee, <br><br> and <br><br> TENET HEALTHCARE CORPORATION, <br><br> Defendant. | No.   21-16532 <br><br> D.C. No. <br> 1:17-cv-01348-DAD-SAB <br><br> ORDER AND <br> AMENDED OPINION |

Appeal from the United States District Court
for the Eastern District of California
Dale A. Drozd, District Judge, Presiding

Argued and Submitted June 17, 2022
San Francisco, California

Before:  Sidney R. Thomas, Carlos T. Bea, and Holly A. Thomas, Circuit Judges.

# SUMMARY[*]

## Disability Discrimination

The panel affirmed the district court's judgment, after a bench trial, in favor of Doctors Medical Center of Modesto, Inc., in an action brought by two deaf plaintiffs who alleged that the hospital failed to afford them effective communication during a series of hospital stays, in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Affordable Care Act, and California's Unruh Civil Rights Act.

The panel affirmed the district court's dismissal as moot of plaintiffs' ADA claims for injunctive relief, which were resolved by a third plaintiff's acceptance of an offer of judgment under which the district court issued an injunction against the hospital concerning its practices for communicating with deaf patients.

As to the Section 504 Rehabilitation Act claims, the panel held that the district court properly ruled that plaintiffs failed to show that they were denied program benefits on the basis of their disabilities because they did not show that the hospital failed in its affirmative obligation to provide the auxiliary aids necessary to afford them effective communication. The panel held that the district court did not err by failing to apply "primary consideration," an ADA Title II rule, to the Section 504 claims, because there is no evidence that Section 504 contains an implicit requirement that a covered entity give primary consideration to the requests of the individual with disabilities when determining what types of auxiliary aids to use. The panel held that the district court properly evaluated the effectiveness of the hospital's communication methods based on a day-by-day factual context and did not give undue weight to the presence or absence of a request for an accommodation by plaintiffs. In addition, the hospital did not deprive plaintiffs of effective communication each time it relied upon note-writing, rather than an American Sign Language interpreter. And the district court did not clearly err in finding that, despite occasional difficulties with a video remote interpreting system, there was effective communication between plaintiffs and the hospital.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel next addressed ACA Section 1557's provision that "an individual shall not, on the ground prohibited under . . . [the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." On September 8, 2015, the Department of Health and Human Services proposed a rule applying ADA Title II's effective communication standards, including the primary consideration rule, to Title III entities like the hospital. This rule did not become effective until after one plaintiff's hospitalization. The panel declined to hold, through an application of *Skidmore* deference to the then-proposed rule, that the primary consideration rule governed the plaintiff's ACA claim. Because plaintiffs' ACA claims were otherwise subject to the same analysis as their Section 504 claims, the panel held that the district court did not err in concluding that plaintiffs failed to establish a violation of Section 1557.

Because plaintiffs did not establish that the hospital engaged in any disability discrimination, their California Unruh Act claims also failed.

The panel addressed in a concurrently filed memorandum disposition plaintiffs' contentions that the district court's judgment should be reversed because it was based on clearly erroneous factual findings.

## COUNSEL

David J. Hommel (argued) and Andrew Rozynski, Eisenberg & Baum LLP, New York, New York, for Plaintiffs-Appellants.

Jeffrey D. Polsky (argued), Fox Rothschild LLP, San Francisco, California; Marsha M. Piccone, Fox Rothschild LLP, Denver, Colorado; for Defendant-Appellee.

Order;
Opinion by Judge H.A. Thomas

**ORDER**

The Opinion filed on September 12, 2022, is amended as follows.

On slip opinion page 5, line 27, delete <Following a bench trial, the> and insert the following text: <The>.

On slip opinion page 19, footnote 7, delete the text accompanying footnote 7 and insert the following:

> The Baxes cite an ADA technical assistance manual from DOJ in support of their argument that DMC's reliance on note-writing was categorically inappropriate. *See* U.S. Dep't of Justice, *ADA Best Practices Tool Kit for State and Local Governments – Ch. 3, General Effective Communication Requirements Under Title II of the ADA* (Feb. 27, 2007), https://www.ada.gov/pcatoolkit/chap3toolkit.htm (TAM). They contend that this manual is entitled to "substantial deference" under our precedent.

> Assuming Plaintiffs are correct about the level of deference due to the technical assistance manual, *see Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1028 (9th Cir. 2008); *see also Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101, 1106 (9th Cir. 2021), the manual does not answer the question whether DMC was categorically prohibited from relying on written notes. Instead, the manual makes clear that the effectiveness of auxiliary aids must be determined on a case-by-case basis, varying with the "context, . . . length and complexity of the communication as well as the format." *See* TAM. The manual contains no categorical prescription as to the appropriate "aids and services" that are required for any particular context, stating only that certain aids or services "*may* be required" in various settings. *Id.* (emphasis added). In short, the manual reaffirms that our analysis under the "effective communication" rule is context dependent.

> In *Silva*, the Eleventh Circuit cites to a different piece of ADA interpretive guidance from DOJ, 28 C.F.R. Pt. 36, app. A, in determining

2

what constitutes "effective communication." *See* 856 F.3d 824 at 837 n.8 (citing 28 C.F.R. Pt. 36, app. A). While the Baxes cite to this portion of *Silva*, they do not make the argument that 28 C.F.R. Pt. 36, app. A is entitled to administrative deference. We therefore do not consider any such arguments here. *See Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018).

The petition for panel rehearing, Dkt. No. 35, is otherwise **DENIED**, and no further petitions for rehearing will be accepted.

H.A. THOMAS, Circuit Judge:

This case concerns the rights of deaf patients to effective communication about their medical care under federal and state antidiscrimination laws. Plaintiffs Mark and Lucia Bax are a married couple who have each been deaf since early childhood. They appeal from the district court's judgment, entered following a three-day bench trial, on their claims under (1) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181 *et seq.*; (2) Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794; (3) Section 1557 of the Affordable Care Act (ACA), 42 U.S.C. § 18116(a); and (4) California's Unruh Civil Rights Act (Unruh Act), Cal. Civ. Code § 51, against Defendant Doctors Medical Center of Modesto, Inc. (DMC), an acute care hospital. The Baxes alleged that DMC failed to afford them effective communication during a series of hospital stays between 2015 and 2017.

Under all four statutes, the governing legal standard is substantially similar: To avoid discriminating against persons with disabilities, covered entities must ensure meaningful access to their services. In circumstances such as those presented here, the touchstone of the accessibility analysis is whether the entity provided auxiliary aids sufficient to ensure "effective communication" with deaf patients.

The district court concluded that DMC satisfied this obligation under the

federal and state antidiscrimination laws at issue. We affirm.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.

Mark and Lucia Bax, a married couple, have each been deaf since early childhood. Mr. Bax considers his first language to be American Sign Language (ASL)[1] and his second language to be English. Mrs. Bax considers her first language to be Spanish, her second language to be ASL, and her third language to be English.

DMC is an acute care hospital in Modesto, California. Mr. Bax was a patient at DMC in October and November 2015, and Mrs. Bax accompanied him during his stays. Mrs. Bax was a DMC patient in January 2017, accompanied by Mr. Bax. During the period of the Baxes' stays, DMC contracted with an interpreting service to provide in-person ASL interpreters for patients. DMC also contracted with another company to provide ASL interpretation via video remote interpreting (VRI)—an interpreting service that uses real-time, full-motion video and audio over a high-speed internet connection to permit a live ASL interpreter to

---

[1] "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *EEOC v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1105 (9th Cir. 2010).

communicate with a doctor and patient through a portable screen from a remote location.

Mr. Bax received in-patient medical care at DMC from October 13 to 27, 2015, and November 12 to 18, 2015, to treat his diabetes and a wound infection on his foot, which required three surgeries and ultimately amputation of his left pinky toe. Mr. Bax's treatment at DMC also included a diabetes diagnosis, physical therapy, and various patient education sessions concerning diabetes.

During his fifteen-day October 2015 hospital stay, Mr. Bax requested an in-person interpreter on eight days. DMC provided an in-person interpreter on six of those days. On a seventh day, DMC attempted to use VRI to communicate with Mr. Bax, but the equipment malfunctioned due to internet connectivity issues, precluding meaningful communication with the remote interpreter. On the remaining day, DMC denied Mr. Bax's request for an interpreter to translate a Medicare notice. In addition to using interpreters, DMC staff often communicated with the Baxes during Mr. Bax's stay by writing notes, including to convey his diabetes diagnosis, conduct patient education sessions, and discuss post-operative care.

Mr. Bax returned to DMC for a surgical follow-up appointment on November 12, 2015. He was ultimately hospitalized for seven days of treatment, including a third foot surgery. During this hospitalization, Mr. Bax requested an in-

person interpreter on three days, and DMC provided an interpreter on each of those days. On November 13, DMC provided in-person interpretation during the day and VRI at night. Connectivity issues with the VRI, however, interfered with Mr. Bax's ability to use it to communicate with DMC staff. On the remaining days of Mr. Bax's November hospitalization, DMC staff communicated with him in writing, including for emergency room evaluation, diagnosis, treatment counseling, and patient education.

On January 12, 2017, Mrs. Bax sought treatment at DMC's emergency room for pain in her kidney, neck, and back, and was admitted to the hospital for a few hours. During her stay, Mrs. Bax communicated with an emergency room physician assistant via VRI.

**B.**

The Baxes, along with co-Plaintiff Mary Birmingham, filed this action against DMC, alleging disability discrimination under (1) Title III of the ADA; (2) Section 504; (3) Section 1557 of the ACA; (4) the Unruh Act; and (5) the California Disabled Persons Act (CDPA), Cal. Civ. Code § 54 *et seq.* Plaintiffs sought declaratory and injunctive relief concerning DMC's policies for providing communication aids, including interpreter services, for deaf or hard-of-hearing individuals. They also sought monetary damages and attorneys' fees.

The district court granted partial summary judgment to DMC and dismissed the CDPA claim, the Unruh Act claim (to the extent based on intentional discrimination), and Mrs. Bax's compensatory damages claim under Section 504 and the ACA. The district court denied summary judgment on Mr. Bax's compensatory damages claims under Section 504 and the ACA and on each Plaintiff's "companion claims."[2] Plaintiff Birmingham's claims were resolved by her acceptance of an offer of judgment under which the district court issued an injunction against DMC concerning its practices for communicating with deaf patients.

The Baxes and DMC proceeded to a bench trial on the four remaining claims—the ADA, Section 504, ACA, and (to the extent not based on intentional discrimination) Unruh Act claims. Over the course of three days, the district court heard testimony from nine witnesses and considered 132 exhibits. Of the Baxes, the district court stated that it found them to be "poor historians with contradicting and inconsistent accounts of what happened during their hospitalizations." It also "question[ed] the[ir] credibility . . . as witnesses." The district court ultimately

---

[2] "Deaf persons are protected by the ADA and [Section 504] not only as patients, but also as companions to patients who are seeking treatment." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 830 n.3 (11th Cir. 2017) (citing 28 C.F.R. § 36.303(c)(1)); *see also Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 868 (9th Cir. 2014) (same).

issued findings of fact and conclusions of law in favor of DMC on all remaining claims and entered judgment for DMC. It concluded that DMC provided an in-person interpreter almost every time one had been requested and that DMC's use of in-person interpreters and other communication methods, including VRI and note-writing, had afforded the Baxes effective communication under the relevant statutes. The Baxes timely appealed.

## II.    JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. After a bench trial, we review a district court's conclusions of law and mixed questions of law and fact de novo. *See OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011). The district court's factual findings are reviewed for clear error. *Id.* "[W]e will affirm a district court's factual finding unless that finding is illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

## III.    DISCUSSION

The Baxes contend that the evidence presented at trial entitled them to judgment as a matter of law on their ADA, Section 504, ACA, and Unruh Act

9

claims.[3] Before turning to the merits, we note that although the same substantive "effective communication" standard applies to all of the Baxes' claims, certain statutes are subject to different implementing regulations; each claim therefore requires individual analysis. We accordingly address each claim in turn.

## A.

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to provide clear, strong, consistent, enforceable standards addressing [such] discrimination." 42 U.S.C. § 12101(b)(1)–(2). Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." *Id.* § 12182(a). The parties do not dispute that DMC is covered by Title III.

Because private plaintiffs can sue for only injunctive relief under the ADA, a defendant's voluntary removal of barriers to accessibility prior to trial can moot an ADA claim. *See Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 905 (9th Cir. 2011).

---

[3] The Baxes also contend that the district court's judgment should be reversed because it was based on clearly erroneous factual findings. We disagree, and address those contentions in a concurrently filed memorandum disposition.

The parties do not dispute that the resolution of Plaintiff Birmingham's claims also resolved the Baxes' requests for injunctive relief. The district court therefore correctly dismissed the Baxes' ADA Title III claim as moot.

**B.**

"Section 504 of the Rehabilitation Act prohibits organizations that receive federal funds, including health care providers, from discriminating against individuals with disabilities." *Ervine*, 753 F.3d at 868; 29 U.S.C. § 794. To prevail on a Section 504 claim, a plaintiff must establish that "(1) he is an individual with a disability; (2) he is otherwise qualified to receive [a certain] benefit; (3) he was denied the benefits of [a certain] program solely by reason of his disability; and (4) the program receives federal financial assistance." *Updike v. Multnomah County*, 870 F.3d 939, 949 (9th Cir. 2017). Where, as here, plaintiffs seek compensatory damages under Section 504, they "must clear an additional hurdle:" proving a "*mens rea* of intentional discrimination . . . which 'may be met by showing deliberate indifference.'" *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 969 (9th Cir. 2021) (quoting *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016)). There is no dispute that DMC is an entity covered by Section 504.

Compliance with Section 504's antidiscrimination mandate "include[s] an affirmative obligation for [recipients of federal funds] to make benefits, services,

11

and programs accessible to people with disabilities." *Updike*, 870 F.3d at 949. The Department of Health and Human Services' (HHS) implementing regulations further define this accessibility obligation as, among other things, a general mandate to provide a qualified person with a disability (i) "the opportunity to participate in or benefit from the aid, benefit, or service;" (ii) "an opportunity to participate in or benefit from the aid, benefit, or service that is . . . equal to that afforded others;" and (iii) "an aid, benefit, or service that is . . . as effective as that provided to others." 45 C.F.R. § 84.4(b)(1). The regulations further clarify that to be "equally effective," the "aids, benefits, and services" need not "produce the identical result or level of achievement," but rather must ensure that a person with disabilities has an "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." *Id.* § 84.4(b)(2).

Accordingly, to ensure accessibility for persons with a hearing disability, the relevant regulations require funds-recipients to "provide appropriate auxiliary aids . . . where necessary to afford such persons an equal opportunity to benefit from the service in question." *Id.* § 84.52(d)(1); *see also Ervine*, 753 F.3d at 868–69. Such "auxiliary aids may include . . . interpreters, and other aids for persons with impaired hearing. . . ." 45 C.F.R. § 84.52(d)(3).

12

This case turns on the third element of a Section 504 claim: whether DMC discriminated against the Baxes by denying them program benefits on the basis of their disabilities. Specifically, the Baxes contend that DMC failed in its affirmative obligation to provide the auxiliary aids necessary to afford them "effective communication." *See Updike*, 870 F.3d at 950; *Silva*, 856 F.3d at 835 ("The proper inquiry under the ADA and [Section 504] is simply to examine whether the hospital provided the kind of auxiliary aid necessary to ensure that a deaf patient was not impaired in exchanging medically relevant information with hospital staff.").[4]

Assessing whether an entity "provided appropriate auxiliary aids where necessary" to afford effective communication "is a fact-intensive exercise." *Updike*, 870 F.3d at 958. The trier of fact must "weigh [several] factors," including "the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the

---

[4] Claims under Section 504 are governed by the same substantive standard of liability as ADA claims. *See Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021) ("The two laws are interpreted coextensively because there is no significant difference in the analysis of rights and obligations created by the two Acts." (internal quotation marks omitted)). For that reason, we have often addressed ADA and Section 504 claims together, and we similarly rely on ADA regulations to elaborate the substantive standard for effective communication under Section 504. *See, e.g., Csutoras*, 12 F.4th at 968–69; *Updike*, 870 F.3d at 951; *Duvall v. County of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001).

communication is taking place." *Id.* at 950; *see also Silva*, 856 F.3d at 836 (same). The requirement that entities provide effective communication therefore "does not mean that deaf patients are entitled to an on-site interpreter every time they ask for it." *Silva*, 856 F.3d at 835; *see also Updike*, 870 F.3d at 958 (holding that the plaintiff was not "necessarily . . . entitled to have an ASL interpreter as a matter of course to achieve effective communication," because "whether the County provided appropriate auxiliary aids where necessary is a fact-intensive exercise"). Rather, the test is whether an individual has received an auxiliary aid sufficient to prevent any "real hindrance" in her ability to exchange information. *Silva*, 856 F.3d at 835.

We emphasize that covered entities "should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication." *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 963 (9th Cir. 2019) (quoting 28 C.F.R. § 36.303(c)(1)(ii)). The ADA regulations applicable to public accommodations, however, make clear that "the ultimate decision as to what measures to take rests with the public accommodation,

provided that the method chosen results in effective communication." *Id*. (quoting

28 C.F.R. § 36.303(c)(1)(ii)).[5]

In accord with these principles, the district court evaluated the evidence

concerning DMC's communications with the Baxes on each day of their respective

stays. The district court concluded—given the totality of the circumstances—that

DMC effectively communicated with the Baxes through the course of their

respective treatments using a variety of auxiliary aids, including in-person and

remote interpreters and written notes. Contrary to the Baxes' contentions, there is

no legal error in the district court's analysis.

### i.

As an initial matter, the Baxes argue that the district court erred by failing to

apply "primary consideration"—a rule generally relevant to ADA Title II claims—

to their Rehabilitation Act claims. We reject this argument.

Under the Department of Justice's (DOJ) implementing regulations for

Title II, covered entities "shall give primary consideration to the requests of the

individual with disabilities" when "determining what types of auxiliary aids" to

use. 28 C.F.R. § 35.160(b)(2); *see also K.M. ex rel. Bright v. Tustin Unified Sch.*

---

[5] The degree to which a covered entity must defer to a person's choice of accommodation under the Rehabilitation Act is addressed in more detail in Section III.B.i, *infra*.

15

*Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013). "Giving primary consideration means that a Title II entity must 'honor the person's choice, unless it can demonstrate that another equally effective means of communication is available, or that the use of the means chosen would result in a fundamental alteration [to the entity's program] or in an undue burden.'" *Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 65 (2d Cir. 2021) (per curiam) (quoting U.S. Dep't of Justice, Civil Rights Div., Disability Rights Section, ADA Requirements, Effective Communication, https://www.ada.gov/effective-comm.pdf (Jan. 2014), at 6).

The Baxes argue that because Title II and Section 504 share a substantive standard of liability, *see, e.g.*, *Payan*, 11 F.4th at 737, Title II's "primary consideration" rule must be imported into Section 504 as well. But we have previously held that "there are material differences between the statutes as a whole," and that—while the two laws may share a substantive standard of liability—"the connection between Title II and Section 504 is nuanced." *K.M.*, 725 F.3d at 1099. One of those nuances concerns the statutes' respective "jurisdictions," which, though "overlapping," are "not coextensive: Section 504 governs all entities receiving federal funds (public or private), while Title II governs all public entities (federally funded or not)." *Id.* In addition, in promulgating regulations to implement ADA Title III—which covers public accommodations like DMC—DOJ explicitly declined to apply the "primary

16

consideration" rule to Title III entities. *See* 28 C.F.R. § 36.303(c)(1)(ii) ("A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication."). DOJ guidance on Title III further states that "Congress did not intend under title III to impose upon a public accommodation the requirement that it give primary consideration to the request of the individual with a disability." 28 C.F.R. pt. 36, app. A.

Given the nuances between the statutes and their associated implementing regulations, we hold that Section 504 does not contain a "primary consideration" rule akin to the regulation applicable to ADA Title II entities. As an initial matter, the Baxes have not identified any language within Section 504 to support the contention that it contains a primary consideration requirement for all covered entities, regardless of whether they are ADA Title II public entities or Title III public accommodations. Nor have they pointed to any other indicia of Section 504's statutory meaning that would support such a requirement. What is more, under the Baxes' proposed interpretation of Section 504, federally funded public accommodations (*i.e.*, certain ADA Title III entities) would be subject to a primary consideration requirement—a rule derived from ADA Title II—in direct

17

contravention of Congress's intention that such a rule not apply to those entities under the ADA. *See id.*

We decline to read such a rule into Section 504. There is no evidence that Section 504, which was enacted well before the Title II primary consideration regulation was implemented, contains an implicit primary consideration requirement.[6] Such a rule would muddle the "nuanced" relationship between Section 504 and the ADA, through which DOJ has made "primary consideration" applicable only to public entities, not public accommodations like DMC. *See K.M.*, 725 F.3d at 1099.

In evaluating the Baxes' Section 504 claims, the district court did not err in refusing to apply the "primary consideration" rule to DMC under that statute.

**ii.**

The Baxes next contend that the district court erred as a matter of law in assessing the effectiveness of DMC's communication by giving undue weight to the presence or absence of a request for an accommodation by the Baxes.

It is axiomatic that an "entity's duty to look into and provide a reasonable accommodation may be triggered when 'the need for accommodation is obvious,'"

---

[6] DOJ promulgated the primary consideration rule in 1991. *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35694-01 (July 26, 1991) (codified at 28 C.F.R. pt. 35). Section 504 was enacted in 1973. Rehabilitation Act, Pub L. No. 93-112, 87 Stat. 355 (1973).

18

even if no request has been made. *Updike*, 870 F.3d at 951, 954 n.6 (quoting *Duvall*, 260 F.3d at 1139). A contrary rule—*i.e.*, one that would permit facilities to fail to provide accommodations to a person with a disability unless she "specifically requests such aid," would be "untenable and cannot be countenanced." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (Jackson, J.) (rejecting the "suggestion that a prison facility need not act to accommodate an obviously disabled inmate if the inmate does not ask for accommodations" as "truly baffling as a matter of law and logic"). Individuals "with known communications-related difficulties"—including those related to hearing—may not be able to "communicate a need for accommodations." *Id*. It would defy reason to construe Section 504 as "unavailable to such disabled persons unless they somehow manage to overcome their communications-related disability sufficiently enough to convey their need for accommodations effectively." *Id.* at 270. A request for accommodation rather "performs a signaling function." *Id.* It puts the covered entity on notice of the need for an accommodation. But where a disability "is obvious and indisputably known to the provider of services," *id.*, such a request would be redundant and unnecessary.

Throughout its findings of fact and conclusions of law, the district court repeatedly considered whether the Baxes had requested an ASL interpreter on a particular day or otherwise complained to DMC staff about their communication

19

methods. Rather than treating such requests or complaints as dispositive, the district court appropriately analyzed their "signaling" function and used their presence (or absence) as circumstantial evidence of whether DMC's communication methods on any given day were effective for the Baxes. The district court's evaluation of the effectiveness of DMC's communication methods based on a day-by-day factual context was not legally erroneous. Indeed, the district court engaged in precisely the sort of fact-intensive exercise our precedent requires.

### iii.

Next, the Baxes contend that DMC deprived them of effective communication each time it relied upon note-writing, rather than an ASL interpreter, during "complex communications."[7] We disagree.

---

[7] The Baxes cite an ADA technical assistance manual from DOJ in support of their argument that DMC's reliance on note-writing was categorically inappropriate. *See* U.S. Dep't of Justice, *ADA Best Practices Tool Kit for State and Local Governments – Ch. 3, General Effective Communication Requirements Under Title II of the ADA* (Feb. 27, 2007), https://www.ada.gov/pcatoolkit/chap3toolkit.htm (TAM). They contend that this manual is entitled to "substantial deference" under our precedent.

Assuming Plaintiffs are correct about the level of deference due to the technical assistance manual, *see Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1028 (9th Cir. 2008); *see also Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101, 1106 (9th Cir. 2021), the manual does not answer the question whether DMC was categorically prohibited from relying on written notes. Instead, the manual makes clear that the effectiveness of auxiliary

We do not apply categorical rules to determine which auxiliary aids are required to achieve effective communication. *See Updike*, 870 F.3d at 956, 958. Thus, whether written notes constitute an appropriate accommodation must be evaluated under the totality of the circumstances, and on a case-by-case basis. *See id.* at 956.

Consistent with this precedent, the district court conducted a thorough, day-by-day analysis of the written communications between the Baxes and DMC. The district court permissibly treated the absence of a request for an interpreter, or any complaints by the Baxes about certain written communications, as circumstantial evidence of effectiveness. It took into account the extensive detail with which Mr. Bax was able to communicate with medical staff through writing and examined the evidence demonstrating that he repeatedly confirmed his understanding of their

---

aids must be determined on a case-by-case basis, varying with the "context, . . . length and complexity of the communication as well as the format." *See* TAM. The manual contains no categorical prescription as to the appropriate "aids and services" that are required for any particular context, stating only that certain aids or services "*may* be required" in various settings. *Id.* (emphasis added). In short, the manual reaffirms that our analysis under the "effective communication" rule is context dependent.

In *Silva*, the Eleventh Circuit cites to a different piece of ADA interpretive guidance from DOJ, 28 C.F.R. Pt. 36, app. A, in determining what constitutes "effective communication." *See* 856 F.3d 824 at 837 n.8 (citing 28 C.F.R. Pt. 36, app. A). While the Baxes cite to this portion of *Silva*, they do not make the argument that 28 C.F.R. Pt. 36, app. A is entitled to administrative deference. We therefore do not consider any such arguments here. *See Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018).

written communications. The district court also considered Mr. Bax's countervailing testimony that he was "unable to write in English a good enough sentence for [DMC's] comprehension of what [he] was going through" and had difficulty understanding the staff's responses.

The district court did not clearly err in finding that written communications with Mr. Bax were effective each time they were used, including to convey medical history and during patient education, post-operative discussions, and physical therapy sessions. In conducting an exhaustive, totality-of-circumstances review of the communications between the Baxes and DMC, the district court also correctly applied the law in holding that note-writing constituted an appropriate accommodation in this case.[8] *See* Section III.B.ii, *supra*.

**iv.**

The Baxes also argue that DMC's use of VRI failed to afford them effective communication because DMC failed to comply with regulations requiring that a VRI system provide "high-speed[,] . . . high-quality video images," free of "lags,"

---

[8] To be sure, certain interactions with DMC staff, such as Mr. Bax's post-operative discussions with Dr. Michael Wolterbeek on October 17, 2015, may have been better facilitated by an ASL interpreter. *See Updike*, 870 F.3d at 956. But on this record, the district court's factual finding that note-writing afforded the Baxes effective communication is not clearly erroneous.

"choppy . . . images," or "irregular pauses in communication." 28 C.F.R. § 36.303(f). We reject this contention.

Under the applicable regulation, a public accommodation that uses VRI must provide:

(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;

(2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position;

(3) A clear, audible transmission of voices; and

(4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI. *Id.*

In arguing that DMC failed to comply with this regulation, the Baxes cite two instances of choppy VRI transmission, as well as DMC's admission in discovery responses that the VRI network connection "may have been slow" on some occasions. Despite these occasional difficulties with the VRI system, the district court did not clearly err in finding that there was effective communication between the Baxes and DMC. While the regulation requires that VRI systems generally produce clear, high-quality, real-time images, we reject the notion that isolated technical glitches necessarily establish ineffective communication. *Accord Siegel v. Dignity Health*, No. CV-14-02561, 2019 WL 11720205, at *3 (D. Ariz. Mar. 26,

23

2019); *Juech v. Child.'s Hosp. & Health Sys., Inc.*, 353 F. Supp. 3d 772, 780 (E.D. Wis. 2018).

As to the contention that VRI was not effective for Mrs. Bax, the district court found that she was "not a reliable witness" and that her testimony concerning the effectiveness of the VRI system was not credible. Namely, the district court observed that Mrs. Bax's records documented her communications in detail and that no notes indicated she experienced communication difficulties with the VRI system. The district court also noted the testimony of a physician assistant, who attended to Mrs. Bax, that "both he and the remote interpreters had a practice of asking the patient if there were any questions or issues with the communication before ending the remote session." District court "credibility findings are entitled to special deference," *see Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1182 (9th Cir. 2017); Fed. R. Civ. P. 52(a)(6), and the Baxes fail to meaningfully argue that those, or the district court's other factual findings concerning VRI, were clearly erroneous.

\* \* \*

The district court did not err in concluding that the Baxes failed to establish a violation of Section 504.[9]

---

[9] In light of our conclusion that the Baxes failed to establish a violation of Section 504's effective communication mandate, we do not address the district court's alternative conclusion that the Baxes failed to satisfy the deliberate indifference standard required for compensatory damages under Section 504.

## C.

Section 1557 of the ACA provides that "an individual shall not, on the ground prohibited under . . . [the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). On September 8, 2015, HHS proposed a rule applying Title II's effective communication standards—including, as relevant here, the "primary consideration" rule—to Title III entities like DMC. *See Vega-Ruiz*, 992 F.3d at 65–66, 65 n.5. In adopting this rule, the agency reasoned that "it is appropriate to hold all recipients of Federal financial assistance from HHS to the higher Title II standards as a condition of their receipt of . . . assistance" and to "hold HHS itself to the same standards to which the Department subjects the recipients of its financial assistance." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31375-01, 31421 (May 18, 2016).

The HHS rule did not become effective until July 18, 2016, after Mr. Bax's hospitalization. *See Vega-Ruiz*, 992 F.3d at 65 n.5. While it is undisputed that this regulation does not have binding retroactive effect, *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), the Baxes contend that, through an application of *Skidmore* deference to the then-proposed rule, we should hold that

25

the "primary consideration" standard governs Mr. Bax's ACA claim. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). We decline to reach this conclusion.

A proposed regulation is entitled to respect under *Skidmore* if it has the "power to persuade." *Plancarte Sauceda v. Garland*, 23 F.4th 824, 832 (9th Cir. 2022) (quoting *Skidmore*, 323 U.S. at 140). The deference given to an agency action may "range from 'great respect' to 'near indifference,' depending on 'the degree of the agency's care, its consistency, formality, and relative expertise, and . . . the persuasiveness of the agency's position.'" *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1141 (9th Cir. 2007) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)). Factors relevant to persuasiveness under *Skidmore* include the agency's thoroughness, "the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Garcia v. Holder*, 659 F.3d 1261, 1267 (9th Cir. 2011) (quoting *Skidmore*, 323 U.S. at 140).

In this case, some *Skidmore* factors—such as the proposed rule's "consistency with . . . later pronouncements" (*i.e.*, the now-effective rule, applying Title II's primary consideration rule to Title III entities) and the "validity of its reasoning," *see* 81 Fed. Reg. at 31421—favor applying the proposed regulation to Mr. Bax's claims.[10]

---

[10] Indeed, the Second Circuit has concluded that these "proposed regulations . . . are persuasive" even if they "took effect after [the plaintiff's] alleged harm." *Vega-*

26

On the other hand, "primary consideration" is an ADA Title II rule, and the plain text of Section 1557's disability discrimination provision incorporates the Rehabilitation Act but not the ADA. 42 U.S.C. § 18116(a). And as explained above, *see* Section III.B.i, *supra*, we conclude that the Rehabilitation Act does not impose a "primary consideration" requirement on Title III entities like DMC.

In light of these competing considerations and our conclusion that the Rehabilitation Act does not require "primary consideration," we are persuaded that it would be anomalous to interpret the ACA (which incorporates the Rehabilitation Act) as having imposed a primary consideration requirement before the HHS rule became effective. We therefore hold that the district court did not err in declining to

---

*Ruiz*, 992 F.3d at 65 n.5; *see also Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 850 (D.S.C. 2015) (concluding "the proposed regulations provide persuasive authority to support a finding . . . that CVS provides and administers health programs or activities that fall within the meaning of Section 1557").

While we respect the judgment of our sister circuit in *Vega-Ruiz*, that court's treatment of the deference due to the proposed regulation was truncated. *See Vega-Ruiz*, 992 F.3d at 65 n.5 (holding, without elaboration, that "[i]t is not unreasonable to give the then-proposed, now-realized distinctions between the Rehabilitation Act and the ACA some weight"). Moreover, the issue in *Vega-Ruiz* was not the merits of an ACA claim, but "which statute of limitations period to apply" to such a claim. *Id.* at 66. Accordingly, we do not find *Vega-Ruiz* persuasive on the question presented here. *Callum* is even further afield. *See* 137 F. Supp. 3d at 848–49. That case dealt with the meaning of the phrase "health program or activity" under the ACA, rather than the applicability of the primary consideration rule.

27

apply such a requirement when analyzing Mr. Bax's claims.[11] And because the Baxes' ACA claims are otherwise subject to the same analysis as their Section 504 claims, the district court did not err in concluding that the Baxes failed to establish a violation of Section 1557.

## IV.

"In the disability context, California's Unruh Civil Rights Act operates virtually identically to the ADA. . . . Any violation of the ADA necessarily constitutes a violation of the Unruh Act."[12] *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007) (citing Cal. Civ. Code § 51(f)). The district court concluded DMC did not violate the Unruh Act for the same reasons that it rejected the Section 504 claims. Because the Baxes have not established that DMC engaged

---

[11] The district court correctly applied the "primary consideration" rule to Mrs. Bax's claim but concluded that "the evidence at trial established that Mrs. Bax requested an ASL interpreter and that is what she received." The Baxes do not meaningfully challenge that determination on appeal.

[12] While it is also possible "to establish a violation of the Unruh Act independent of a claim under the [ADA]" by proving "intentional discrimination in public accommodations," *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014), the Baxes did not appeal the district court's dismissal of their intentional discrimination theory under the Unruh Act. Accordingly, we treat their Unruh Act, ADA, and Section 504 claims as coextensive.

in any disability discrimination, *see* Section III, *supra*, their Unruh Act claims also fail.[13]

* * *

Because we find no error in the district court's treatment of the Baxes' disability discrimination claims, the judgment in favor of DMC is in all respects

**AFFIRMED.**

---

[13] The Baxes also argue that the "primary consideration" rule applies to DMC under the Unruh Act. We reject this contention. The plain text of the Unruh Act provides: "A violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section." Cal. Civ. Code § 51(f). Under the ADA, "primary consideration" does not apply to Title III entities like DMC.